DATO, J.
*561 Plaintiff Jesus Cuitlahuac Garcia filed a wage and hour lawsuit against Border Transportation Group, LLC (BTG), its owner Erik Ortega, and BTG employee Martha Ortega. Some of Garcia's claims are based on Industrial Welfare Commission (IWC) wage orders;[1] others are not. The trial court granted defendants' motion for summary judgment on all eight causes of action on the basis that Garcia was an independent contractor, not an employee. After Garcia's appeal was fully briefed, the Supreme Court issued a ruling in Dynamex Operations West, Inc. v. Superior Court (2018) 4 Cal.5th 903, 232 Cal.Rptr.3d 1, 416 P.3d 1 ( Dynamex ), clarifying the employee-independent contractor question as to wage order claims.
As we explain, Dynamex compels the conclusion that defendants did not meet their burden on summary judgment to show no triable issue of material fact as to Garcia's wage order claims. Under part C of the "ABC" test adopted in Dynamex , defendants had to demonstrate that Garcia "is customarily engaged in an independently established trade, occupation, or business" apart from his work for BTG, not that he was merely capable of such *363 engagement. ( Dynamex, supra, 4 Cal.5th at p. 963, 232 Cal.Rptr.3d 1, 416 P.3d 1, italics added.) We reach a different result as to the non-wage-order claims, to which Dynamex does not apply. As to those claims discussed in the nonpublished portion of our opinion, Garcia forfeited appellate review of the trial court's decision that he was not an employee under the standard articulated in S.G. Borello & Sons, Inc. v. Department of Industrial Relations (1989) 48 Cal.3d 341, 256 Cal.Rptr. 543, 769 P.2d 399 ( Borello ).
Accordingly, we reverse the judgment and remand with instructions to enter a new order denying summary adjudication of the wage order causes of action and granting summary adjudication as to the non-wage-order causes of action.
*562 FACTUAL AND PROCEDURAL BACKGROUND[2]
The City of Calexico regulates the local taxicab industry. (Calexico Mun. Code, ch. 5.80.) To operate a taxi service, a person or business must obtain a "certificate of public convenience and necessity" from the city council, which considers public demand for additional taxi service and other factors. (Calexico Mun. Code, ch. 5.80, §§ 5.80.020, 5.80.050.) Each certificate in turn authorizes a certain number of vehicle permits. (Id. , § 5.80.020.)[3] City authorities set rates, approve taxi color schemes and markings, and inspect vehicles. (Id. , §§ 5.80.250, 5.80.270, 5.80.320.)
The Municipal Code contemplates different business models for taxicab service. A driver can "operate[ ] any taxicab or vehicle for hire as an employee," or he can "independently contract[ ] with [a vehicle permit] owner to operate the taxicab or vehicle for hire pursuant to a lease, license, or any other form of agreement." (Calexico Mun. Code, ch. 5.80, § 5.80.010.) To operate a taxi, drivers must obtain a driver's permit from the city. (Id. , § 5.80.110.) The driver's permit "may be used by the driver only while employed by a specified taxi company." (Id. , § 5.80.140.) If the driver starts working for a different vehicle permit owner, an updated permit is required. (Id. , § 5.80.160.)
In July 2008, Erik Ortega purchased assets from the bankruptcy estates of his parents, Jose Ortega (Case No. 06-03848-LA11) and Martha Elba Ortega (Case No. 06-03849-LA11). He bought 11 vehicles with a red color scheme labeled Border Cab, and 14 vehicles with a white color scheme labeled Calexico Taxi. From the mid-1980's to 2008, Jose Ortega was the sole proprietor and owner of Border Cab, and Martha Ortega was the sole proprietor and owner of Calexico Taxi. On January 1, 2009, Erik formed BTG as a limited liability corporation and employed Martha.[4]
*364 BTG owned 30 out of 45 total vehicle permits issued by the City of Calexico. It owned 15 permits for vehicles with a white color scheme marked *563 "Calexico Taxi," and 15 permits for vehicles with a red color scheme marked "Border Cab." The remaining 15 vehicle permits were owned by a different entity, for vehicles marked "California Cab." Erik had no ownership interest in California Cab.
Garcia worked as a driver for BTG. He bought a 1998 Ford Crown Victoria around December 2008. The vehicle had a white color scheme and was marked "Calexico Taxi." He operated that vehicle as a taxi-for-hire from January 2009 to August 2013. This required him to lease a vehicle permit from BTG for about $520 per week; he also signed up for optional radio dispatch service costing $350 per month. A January 2009 lease and February 2012 revised lease labeled Garcia as an independent contractor and disavowed any employment relationship.
The engine of Garcia's Crown Victoria failed in August 2013. Thereafter, he started leasing a vehicle from BTG for $65 per 12-hour shift, on top of existing vehicle permit and radio dispatch fees. Garcia stopped working for BTG in April 2014, following an incident in which he was required to pay an additional $65 shift charge for returning a leased vehicle an hour late. Thereafter, Garcia claims, he was prevented from renewing his lease; defendants maintain he elected not to renew it.
In 2015, Garcia sued defendants for various wage and hour violations occurring between 2010 and 2014.[5] The complaint asserts eight causes of action:
1. Wrongful termination in violation of public policy. ( Lab. Code, §§ 923 [employees may organize], 6310 [retaliation for an OSHA complaint], 6400 [duty to provide a safe work environment], 1102.5 [whistleblower protection].)
2. Unpaid wages under the wage order. ( Cal. Code Regs, tit. 8, § 11090.)
3. Failure to pay minimum wage. ( Lab. Code, §§ 1182.12 [minimum wage], 1194 [right of action], 1194.2 [liquidated damages], 1197 [duty to pay minimum wage].)
4. Failure to pay overtime. ( Lab. Code, §§ 510 [overtime], 1194 [right of action].)
*564 5. Failure to provide meal and rest breaks. ( Lab. Code, §§ 226.7 [rest periods], 512 [meal breaks].)
6. Failure to furnish accurate wage statements. ( Lab. Code, §§ 226 [wage statements], 226.3 [civil penalties], 2699 [PAGA penalties].)
7. Waiting time penalties. ( Lab. Code, §§ 201 -202 [wages and leave due upon departure], 203 [penalties].)
8. Unfair competition (UCL), based on the foregoing violations. ( Bus. & Prof. Code, § 17200 et seq. ; Lab. Code, § 2699 [PAGA penalties].)
Defendants moved for summary judgment. Relying on Borello, supra, 48 Cal.3d 341, 256 Cal.Rptr. 543, 769 P.2d 399, they argued all eight causes of action failed because Garcia was an independent contractor, *365 not an employee. Erik's declaration established various ways in which BTG did not exercise control over drivers. Garcia and others remained free to set their hours, use the car for personal errands, decline the optional radio dispatch service, keep their collected fares, enter into sublease agreements, hold other jobs, advertise services in their own names, etc.
Based on defendants' moving papers,[6] the trial court agreed that Garcia was an independent contractor. It granted summary judgment, explaining:
"The evidence in this case is that there was a lease between -- lease of the taxicab license to the plaintiff as an individual. The lease itself is clear that there was no employer/employee relationship. It directly disclaims that. The evidence of how the arrangement was carried out is consistent with the lease. It does not appear that Border Transport exercised any control over plaintiff's activities that would implicate an employee/employer relationship. For example, there was no evidence that they provided any instruction on operation of the vehicle. There was no sort of employee handbook.
"Border Transport did not dictate plaintiff's rates or require plaintiff to maintain trip sheets. Plaintiff operated his own vehicle, a Crown Victoria. Border Transport did not get any part of the fares. They did not dictate the geographical area. They did not dictate a shift or a schedule. They did not require plaintiff to record his whereabouts. They did not require him to respond to dispatch. They did not require him to turn on the optional radio. They did not dictate when or how often he took breaks. They had no control when he also used his vehicle for personal use. He could and did market his *565 taxicab business in his own name. He was free to use his own cell phone, business phone, or other items. And he could elect not to renew his vehicle lease permit at any time."
DISCUSSION
Garcia contends the trial court erred in denying his request to continue the summary judgment hearing and in refusing to consider the separate statement and other documents filed the day of that hearing. Reviewing these claims for abuse of discretion we find no error.
Turning to the merits, we review the summary judgment ruling de novo, "considering all of the evidence the parties offered in connection with the motion (except that which the trial court properly excluded) and the uncontradicted inferences the evidence reasonably supports." ( Merrill v. Navegar, Inc. (2001) 26 Cal.4th 465, 476, 110 Cal.Rptr.2d 370, 28 P.3d 116.) Summary judgment is proper if the record demonstrates there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. ( Code Civ. Proc., § 437c, subd. (c) ;[7] Aguilar v. Atlantic Richfield Co . (2001) 25 Cal.4th 826, 843, 107 Cal.Rptr.2d 841, 24 P.3d 493.) Because we review the ruling and not its rationale, we affirm an order granting summary judgment "if it is correct on any ground that the parties had an adequate opportunity to address in the trial court, regardless of the trial court's stated reasons." ( *366 Securitas Security Services USA, Inc. v. Superior Court (2011) 197 Cal.App.4th 115, 120, 127 Cal.Rptr.3d 883.)
After briefing on Garcia's appeal was complete, the Supreme Court decided Dynamex, supra, 4 Cal.5th 903, 232 Cal.Rptr.3d 1, 416 P.3d 1, which addresses the employee-independent contractor question as to wage order claims (described post ). We invited the parties to brief the impact of that case, if any, on the issues in this appeal. In his supplemental brief, Garcia argues that Dynamex demonstrates he was an employee. Defendants argue that even under Dynamex , Garcia was an independent contractor. They note that the Supreme Court adopted the Massachusetts formulation of the ABC test, and Sebago, supra, 28 N.E.3d 1139 applied that test to find that taxicab lessees were independent contractors.
As we explain, summary adjudication was erroneous as to the wage order claims but proper as to the non-wage-order claims. As to the former, defendants did not meet their burden to show that Garcia "is customarily engaged in an independently established trade, occupation, or business." ( Dynamex, supra, 4 Cal.5th at p. 963, 232 Cal.Rptr.3d 1, 416 P.3d 1.) As to the latter, Garcia forfeited review.
*566 1. The court did not abuse its discretion in denying Garcia's request for a continuance or in rejecting documents filed the day of the motion hearing .**
2. Legal Framework: Distinguishing "Employees" from "Independent Contractors"
As recognized by the California Supreme Court in Dynamex , under both state and federal law "the question whether an individual worker should properly be classified as an employee or, instead, as an independent contractor has considerable significance for workers, businesses, and the public generally." ( Dynamex, supra, 4 Cal.5th at pp. 912, 913, 232 Cal.Rptr.3d 1, 416 P.3d 1.) "Employees are shielded by antidiscrimination laws, wage and hour laws, and family and medical leave protections; independent contractors are not. Employees can access federal and state programs, including unemployment insurance and worker's compensation; independent contractors cannot. In turn, employers are subject to liability and tax and benefit contribution requirements under these laws only for their employees." (Deknatel & Hoff-Downing, ABC on the Books and in the Courts: An Analysis of Recent Independent Contractor and Misclassification Statutes (2015) 18 U.Pa.J.L. & Soc. Change 53 ; see Dynamex, at p. 950, fn. 20, 232 Cal.Rptr.3d 1, 416 P.3d 1 [citing article].) Given the potential economic incentives a business might have to avoid legal obligations, the risk of misclassifying employees as independent contractors is significant. ( Dynamex, at p. 913, 232 Cal.Rptr.3d 1, 416 P.3d 1.)
Dynamex is the latest effort by the Supreme Court to address the employee-independent contractor distinction, at least in the wage order context. To understand its application to this case, we briefly discuss the broad legal framework.
At common law, the distinction between employees and independent contractors arose in the tort context, in defining a principal's vicarious liability for an agent's conduct. ( Borello, supra, 48 Cal.3d at p. 350, 256 Cal.Rptr. 543, 769 P.2d 399 ; Dynamex, supra, 4 Cal.5th at p. 927, 232 Cal.Rptr.3d 1, 416 P.3d 1.) But owing to their distinct policies, "the concept of 'employment' embodied in [social welfare legislation] is not inherently limited by common law principles." ( *367 Borello , at p. 351, 256 Cal.Rptr. 543, 769 P.2d 399.) In what has come to be viewed as "the seminal California decision on this subject" ( Dynamex, at p. 929, 232 Cal.Rptr.3d 1, 416 P.3d 1 ), the Supreme Court in Borello defined a general approach to determine whether a worker is an employee or an independent contractor.
The question in Borello was whether cucumber pickers were employees of an agricultural grower for purposes of workers' compensation. Drawing from *567 the common law, the court explained that " '[t]he principal test of an employment relationship is whether the person to whom the service is rendered has the right to control the manner and means of accomplishing the result desired....' " ( Borello, supra, 48 Cal.3d at p. 350, 256 Cal.Rptr. 543, 769 P.2d 399.) The right to discharge at will without cause is strong evidence of an employment relationship. ( Ibid. )
But apart from "control," Borello also identified several " 'secondary indicia' " that bear on employment status, principally drawn from the Restatement Second of Agency. ( Borello, supra , 48 Cal.3d at pp. 350-351, 256 Cal.Rptr. 543, 769 P.2d 399.) These include:
"(a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee." ( Id. at p. 351 [256 Cal.Rptr. 543, 769 P.2d 399].)
Borello cautioned that individual factors are intertwined and cannot be mechanically applied. ( Ibid. ) "Each service arrangement must be evaluated on its facts, and the dispositive circumstances may vary from case to case." ( Id. at p. 354, 256 Cal.Rptr. 543, 769 P.2d 399.) Although it can be considered, "[t]he label placed by the parties on their relationship is not dispositive." ( Id. at p. 349, 256 Cal.Rptr. 543, 769 P.2d 399.)
Applied to the facts before it, the Borello court concluded the cucumber pickers were employees. They formed "a regular and integrated portion of [the grower]'s business operation" in which the grower did everything from deciding what to plant to distributing the picked produce to various markets. ( Borello, supra, 48 Cal.3d at p. 357, 256 Cal.Rptr. 543, 769 P.2d 399.) Rejecting the grower's claim that the workers had complete control over how they did their work and were compensated based on the amount of cucumbers picked, the court reasoned that the grower had "all necessary control over the harvest portion of its operations." ( Id. at pp. 356-357, 256 Cal.Rptr. 543, 769 P.2d 399.) In no practical sense could the workers be deemed "entrepreneurs operating independent businesses for their own accounts." ( Id. at p. 345, 256 Cal.Rptr. 543, 769 P.2d 399.) The court cautioned that "[a] business entity may not avoid its statutory obligations by carving up its production process into minute steps, then asserting that it lacks 'control' over the exact means by which one such step is performed by the responsible workers." ( Id. at p. 357, 256 Cal.Rptr. 543, 769 P.2d 399.)
In approving the use of various " 'control' " factors, however, Borello emphasized that whether a worker is an employee *368 must be decided "with deference to the purposes of the protective legislation." ( *568 Borello, supra, 48 Cal.3d at p. 353, 256 Cal.Rptr. 543, 769 P.2d 399.) A court's job is to parse the "nature of the work, and the overall arrangement between the parties" and decide "whether they come within the 'history and fundamental purposes' of the statute." ( Id. at pp. 353-354, 256 Cal.Rptr. 543, 769 P.2d 399.) In this case, as we explain, the IWC's Wage Order No. 9 defines the scope of the employment relationship as to some of Garcia's claims.
The IWC promulgates "constitutionally authorized, quasi-legislative regulations" that "impose obligations relating to the minimum wages, maximum hours, and a limited number of very basic working conditions (such as minimally required meal and rest breaks) of California employees" in various industries. ( Dynamex, supra, 4 Cal.5th at pp. 913-914 & fn. 3, 232 Cal.Rptr.3d 1, 416 P.3d 1.) We focus on the applicable version of Wage Order No. 9, which regulates minimum working conditions for "employees" in the transportation industry. ( Cal. Code Regs., tit. 8, § 11090.)[9]
In Martinez v. Combs (2010) 49 Cal.4th 35, 64, 109 Cal.Rptr.3d 514, 231 P.3d 259, the Supreme Court looked to the definitions contained within wage orders and held that wage orders encompass three alternative definitions of "employ." Under the broadest (relevant here) " '[e]mploy' " means to "suffer, or permit to work." ( Cal. Code Regs., tit. 8, § 11090, subd. 2(D) ; Martinez, at pp. 57-58, 109 Cal.Rptr.3d 514, 231 P.3d 259.) This definition derives from child labor laws, which sought to extend beyond the common law master-servant relationship and target "the defendant's failure to exercise reasonable care to prevent child labor from occurring." ( Martinez, at p. 58, 109 Cal.Rptr.3d 514, 231 P.3d 259.) Applied to modern-day wage and hour claims, "[a] proprietor who knows that persons are working in his or her business without having been formally hired, or while being paid less than the minimum wage, clearly suffers or permits that work by failing to prevent it, while having the power to do so." ( Id. at p. 69, 109 Cal.Rptr.3d 514, 231 P.3d 259.)
Recently, the Supreme Court addressed whether the wage order definitions of " 'employ' " as construed in Martinez applied to certify a class in a wage and hour lawsuit. ( Dynamex, supra, 4 Cal.5th at p. 942, 232 Cal.Rptr.3d 1, 416 P.3d 1.) The delivery drivers sued Dynamex for overtime, reimbursement of business expenses, and other claims, alleging they had been misclassified as independent contractors. ( Ibid. ) As the Supreme Court explained, the trial court properly applied the "suffer or permit to work" definition of employment in Martinez , instead of the "control" test in Borello , to evaluate class certification for wage order *569 claims. ( Id. at pp. 944-945, 950, 232 Cal.Rptr.3d 1, 416 P.3d 1.)[10] The "suffer or permit to work" definition fit the broad remedial purpose of wage orders to protect workers, shield law-abiding businesses from unfair competition, and prevent shifting the costs of ill effects to workers to the public at large. ( *369 Dynamex , at pp. 952-953, 232 Cal.Rptr.3d 1, 416 P.3d 1.)
Next, the Dynamex court considered what test applies to evaluate the employee-independent contractor question under the "suffer or permit to work" definition of "employ." Eschewing a multifactor standard, the court instead adopted the three-part "ABC" test used in many other jurisdictions to decide whether a worker is a covered employee or rather an independent contractor. ( Dynamex, supra, 4 Cal.5th at pp. 956-957, 232 Cal.Rptr.3d 1, 416 P.3d 1.) Unlike a multifactor test, the ABC test " 'allows courts to look beyond labels and evaluate whether workers are truly engaged in a separate business or whether the business is being used by the employer to evade wage, tax, and other obligations.' " ( Id. at p. 958, fn. 26, 232 Cal.Rptr.3d 1, 416 P.3d 1.)
Under the ABC test, a worker is presumed to be an employee, unless the hiring entity establishes each of the following:
"(A) that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; and (B) that the worker performs work that is outside the usual course of the hiring entity's business; and (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed." ( Dynamex, supra, 4 Cal.5th at p. 957 [232 Cal.Rptr.3d 1, 416 P.3d 1].)
Part A involves Borello 's common law "control" test, recognizing that "a business need not control the precise manner or details of the work in order to be found to have maintained the necessary control" for an employer-employee relationship. ( Dynamex,supra, 4 Cal.5th at p. 958, 232 Cal.Rptr.3d 1, 416 P.3d 1 ; see also id. at p. 950, fn. 20, 232 Cal.Rptr.3d 1, 416 P.3d 1 [key question under Borello is "whether the hiring entity has retained 'necessary control' over the work"].)
Part B asks whether the worker can reasonably be viewed as working in the hiring entity's business. ( Dynamex, supra, 4 Cal.5th at p. 959, 232 Cal.Rptr.3d 1, 416 P.3d 1.) This inquiry turns on whether the worker is "reasonably viewed as providing services to the business in a role comparable to that of an employee, rather than in a role comparable to that of a traditional independent contractor." ( Ibid. ) A plumber hired by a retail store would not be considered an employee; by contrast, a cake decorator servicing a bakery for custom cakes, *570 or an at-home seamstress sewing dresses from patterns supplied by a clothing manufacturer, would. ( Id. at pp. 959-960, 232 Cal.Rptr.3d 1, 416 P.3d 1.)
Part C asks whether the worker "independently has made the decision to go into business for himself or herself." ( Dynamex, supra, 4 Cal.5th at p. 962, 232 Cal.Rptr.3d 1, 416 P.3d 1.) This factor can be proven with evidence that the worker has "take[n] the usual steps to establish and promote his or her independent business-for example, through incorporation, licensure, advertisements, routine offerings to provide the services of the independent business to the public or to a number of potential customers, and the like." ( Ibid. ) Critically, as we will discuss, this part requires that the worker is engaged in an independent business, not that he or she could have become so engaged. ( Id. at p. 962 & fn. 30, 232 Cal.Rptr.3d 1, 416 P.3d 1.)
Because "a hiring entity's failure to satisfy any one of the three parts itself *370 establishes that the worker should be treated as an employee for purposes of the wage order, a court is free to consider the separate parts of the ABC standard in whatever order it chooses." ( Dynamex, supra, 4 Cal.5th at p. 963, 232 Cal.Rptr.3d 1, 416 P.3d 1.)
Returning to our case, defendants relied on Borello in moving for summary judgment. The trial court likewise relied on Borello 's "control" factors to find Garcia was an independent contractor. In so doing, it implicitly rejected Garcia's reliance on Yellow Cab Cooperative, Inc. v. Workers' Comp. Appeals Bd. (1991) 226 Cal.App.3d 1288, 277 Cal.Rptr. 434 ( Yellow Cab ), which applied Borello to conclude that a taxi lessee was an employee because the cab company exercised control over the lessee's performance as a driver . The question we must address is whether Dynamex applies to none, some, or all of Garcia's claims and, to the extent it applies, whether defendants met their burden to show the lack of a triable issue as to Garcia's employment status.
3. Dynamex only applies to Garcia's wage-order claims.
" Dynamex did not purport to replace the Borello standard in every instance where a worker must be classified as either an independent contractor or an employee for purposes of enforcing California's labor protections." ( California Trucking Assn. v. Su (9th Cir. 2018) 903 F.3d 953, 959, fn. 4.) To the contrary, the Supreme Court recognized that different standards could apply to different statutory claims:
"[B]ecause the Borello standard itself emphasizes the primacy of statutory purpose in resolving the employee or independent contractor question, when different statutory schemes have been enacted for different purposes, it is possible under Borello that a worker may properly be considered an employee with reference to one statute but not another." ( Dynamex, supra , 4 Cal.5th at p. 948 [232 Cal.Rptr.3d 1, 416 P.3d 1].)
*571 Dynamex applied the "suffer or permit to work" standard contained in the wage order without deciding what standard applied to non- wage-order claims, such as claims for reimbursement of fuel or tolls under Labor Code, section 2802. ( Dynamex, supra , 4 Cal.5th at p. 942, 232 Cal.Rptr.3d 1, 416 P.3d 1. ) It did not reject Borello , which articulated a multifactor test for determining employment status under the Worker's Compensation Act. Nor did it address the appellate court's ruling that "insofar as the causes of action in the complaint ... are not governed by the wage order" and predicated solely on the Labor Code, "the Borello standard is the applicable standard for determining whether a worker is properly considered an employee or an independent contractor." ( Dynamex, at p. 915, 232 Cal.Rptr.3d 1, 416 P.3d 1.)
We follow the approach of the Court of Appeal in Dynamex on our record. It is logical to apply the "suffer or permit to work" standard (and the ABC test that explicates it) to wage order claims. First, the wage order explicitly defines "employ" in this language, and the case law emphasizes "the primacy of statutory purpose in resolving the employee or independent contractor question." ( Dynamex, supra , 4 Cal.5th at p. 948, 232 Cal.Rptr.3d 1, 416 P.3d 1.) Second, wage orders regulate very basic working conditions for covered California employees, thus warranting " 'the broadest definition' " of employment to extend protections to "the widest class of workers." (See id. at pp. 913, 951, 232 Cal.Rptr.3d 1, 416 P.3d 1 ; Cal. Code Regs., tit. 8, § 11090, subd. 1.) There is no reason to apply the ABC test categorically to *371 every working relationship, particularly when Borello appears to remain the standard for worker's compensation. Although both parties agree Dynamex applies to Garcia's case, neither identifies a basis to use the ABC test in evaluating the non-wage-order claims. In the absence of an argument that the statutory purposes underlying those claims compel application of a different standard, we conclude Borello furnishes the proper standard as to Garcia's non-wage-order claims.[11]
Of the eight causes of action alleged in Garcia's complaint, five arise under the wage order: unpaid wages, failure to pay minimum wage (which may overlap), failure to provide meal and rest periods, failure to furnish itemized wage statements, and UCL claims based on the foregoing. These claims are governed by the "suffer or permit to work" standard described in Dynamex .
Garcia's remaining causes of action do not arise under the wage order. The wage order's overtime regulations do not apply to taxicab drivers. ( Cal. Code Regs., tit. 8, § 11090, subd. 3(M).) Likewise, the wage order does not encompass claims for wrongful termination in violation of public policy or waiting time penalties. Accordingly, Garcia's claims for overtime, wrongful termination, waiting time penalties, and UCL claims resting on the foregoing are governed by the common law test articulated in Borello .
*572 4. Dynamex compels reversal as to the wage order claims.
Dynamex changed the appropriate standard for determining whether Garcia was an employee entitled to wage order protection, or an independent contractor who was not.[12] As to his wage order claims, we conclude there is a triable issue as to whether Garcia was an employee under the now-applicable ABC test.
The ABC test "presumes a worker hired by an entity is an employee and places the burden on the hirer to establish that the worker is an independent contractor" by showing each of parts A, B, and C. (Dynamex, supra, 4 Cal.5th at p. 950, fn. 20, 232 Cal.Rptr.3d 1, 416 P.3d 1, italics added.) The failure to establish any one prerequisite is sufficient "to establish that the worker is an included employee, rather than an excluded independent contractor, for purposes of the wage order." ( Id. at p. 964, 232 Cal.Rptr.3d 1, 416 P.3d 1.) We focus our analysis on part C.
*372 "[I]n order to satisfy part C of the ABC test, the hiring entity must prove that the worker is customarily engaged in an independently established trade, occupation, or business." ( Dynamex, supra, 4 Cal.5th at p. 963, 232 Cal.Rptr.3d 1, 416 P.3d 1.) "When a worker has not independently decided to engage in an independently established business but instead is simply designated an independent contractor by the unilateral action of a hiring entity, there is a substantial risk that the hiring business is attempting to evade the demands of an applicable wage order through misclassification." ( Id. at p. 962, 232 Cal.Rptr.3d 1, 416 P.3d 1.)
Key for our purposes, Dynamex makes clear that the question in part C is not whether BTG prohibited or prevented Garcia from engaging in an independently established business. ( Dynamex, supra, 4 Cal.5th at p. 962, 232 Cal.Rptr.3d 1, 416 P.3d 1 *573 ["[t]he fact that a company has not prohibited or prevented a worker from engaging in such a business is not sufficient"].) Instead, the inquiry is whether Garcia fits the common conception of an independent contractor-"an individual who independently has made the decision to go into business for himself or herself" and "generally takes the usual steps to establish and promote his or her independent business-for example, through incorporation, licensure, advertisements, routine offerings to provide services of the independent business to the public or to a number of potential customers, and the like." ( Ibid. )
Dynamex drives this point home in footnote 30. The court cites with approval a Utah case that explained, " 'the appropriate inquiry under part (C) is whether the person engaged in covered employment actually has such an independent business, occupation, or profession, not whether he or she could have one.' " ( Dynamex, supra, 4 Cal.5th at p. 962, fn. 30, 232 Cal.Rptr.3d 1, 416 P.3d 1, citing McGuire v. Dept. of Employment Security (Utah Ct.App. 1989) 768 P.2d 985, 988.) It also references a Vermont decision construing language identical to that in part C as follows:
" 'The adverb "independently" clearly modifies the word "established," and must carry the meaning that the trade, occupation, profession or business was established, independently of the employer or the rendering of the personal service forming the basis of the claim. The present tense 'is' indicates the individual must be engaged in such independent activity at the time of rendering the service involved. "Customarily" means usually, habitually, regularly.' " ( In re Bargain Busters, Inc. (Vt. 1972) [130 Vt. 112] 287 A.2d 554, 559 [cited by Dynamex, at p. 962, fn. 30 [232 Cal.Rptr.3d 1, 416 P.3d 1] ].)
A North Dakota case cited in footnote 30 likewise explains that "to meet the third prong, it is not enough to show that the individuals are free to engage in similar activities for others or work as employees for others." ( Midwest Property Recovery, Inc. v. Job Service of North Dakota (N.D. 1991) 475 N.W.2d 918, 924.) Finally, footnote 30 cites a Connecticut decision that explains it is not enough for a hiring business to permit a worker to engage in activities for other businesses to satisfy part C. ( Dynamex, at p. 962, fn. 30, 232 Cal.Rptr.3d 1, 416 P.3d 1, citing JSF Promotions, Inc. v. Administrator (2003) 265 Conn. 413, 828 A.2d 609, 613 ( JSF Promotions ).)
In their supplemental brief, defendants cite a 2015 Massachusetts Supreme Court case ( Sebago, supra, 28 N.E.3d 1139 ) to argue that on similar facts defendants met their burden to prove part C. Sebago concluded that Boston taxi drivers who leased medallions from owners were " 'customarily *373 engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.' " ( Id. at pp. 1152-1153.) But it defined the "critical inquiry" as "whether 'the worker is capable of performing the service to anyone wishing to avail themselves of the services or, conversely, whether the nature of the business compels the worker to depend on a single employer for the continuation of the services.' " *574 ( Id. at p. 1153.) An earlier Massachusetts case applied the same rubric in part C to conclude Cape Cod taxi drivers were independent contractors. ( Commr. of Div. of Unemployment Assistance v. Town Taxi of Cape Cod, Inc . (2007) 68 Mass.App.Ct. 426, 862 N.E.2d 430, 431.)
The Massachusetts test is simply not the formulation of part C articulated in Dynamex . Defendants are correct that the wording of the ABC test adopted in Dynamex tracks a Massachusetts statute. ( Dynamex, supra, 4 Cal.5th at p. 956, fn. 23, 232 Cal.Rptr.3d 1, 416 P.3d 1.) The Supreme Court explained that it followed Massachusetts in omitting certain language from part B of the ABC test given "contemporary work practices[ ] in which many employees telecommute." ( Ibid. ) Notwithstanding this parallel, Dynamex makes clear that California follows the version of part C that requires an existing, not potential, showing of independent business operation. ( Id. at p. 962, fn. 30, 232 Cal.Rptr.3d 1, 416 P.3d 1.) Had the Dynamex court viewed Sebago as persuasive in this particular context, one would expect it to be cited in footnote 30, which only makes its absence more significant.
In a recent decision, the Connecticut Supreme Court acknowledged the split in how courts construe part C. ( Kirby of Norwich v. Administrator, Unemployment Compensation Act (2018) 328 Conn. 38, 176 A.3d 1180 ( Kirby ).) Kirby noted that in Massachusetts, courts ask whether "the putative employee is free to engage in an independently established occupation, even if the putative employee does not actually do so." ( Id. at p. 1191.) But it declined to follow the Massachusetts formulation based on JSF Promotions, supra, 828 A.2d at page 613. ( Kirby, at p. 1191.) As Kirby explained:
"Any worker who provides services to a business necessarily has a 'trade, occupation, profession or business' that the worker would be free to engage in at some point for another similar entity after his relationship with the business has terminated. If evidence that the worker is actually performing those services for another entity during its relationship with the putative employer were not required, part C would be rendered meaningless." ( Id. at pp. 1191-1192.)
Because footnote 30 in Dynamex favorably cites JSF Promotions to define part C, we follow the Kirby approach and reject Sebago 's alternative construction.
Turning to the record in our case, pursuant to municipal regulations Garcia obtained a driver's permit that was "limited such that it may be used by the driver only while employed by a specified taxi company." (Calexico Mun. Code, ch. 5.80, § 5.80.140.) If Garcia were to switch companies, he would need a new permit bearing the new company's name. (Id. , § 5.80.160.) Accordingly, there is at best limited evidence he was even capable of providing services to a different taxi company under the Sebago framework. With BTG owning 30 of 45 available taxi permits, and municipal regulations conditioning issuance of new permits on public demand for additional *575 service, the facts of this case differ from Sebago , which involved drivers in metropolitan Boston who could "lease taxicabs and medallions from *374 whomever they wish" on a day-to-day basis. ( Sebago, supra, 28 N.E.3d at p. 1153 ; Calexico Mun. Code, ch. 5.80, § 5.80.050(A).) Even if the Sebago framework applied, the nature of the business arguably compels Garcia "to depend on a single employer for the continuation of [his] services." ( Sebago, at p. 1153.)
Under the more stringent part C framework adopted by the California Supreme Court in Dynamex , the result is obvious. Dynamex requires more than mere capability to engage in an independent business. Defendants presented no evidence in their moving papers that Garcia in fact provided services for other entities or otherwise established a business "independent" of his relationship with BTG. (See Kirby, supra, 176 A.3d at pp. 1187-1188 [certain factors besides performing similar work for third parties may also be relevant to part C].) Rather, they rely on the Sebago formulation and suggest Garcia was "free to offer his services as an entrepreneur to anyone he chose."[13]
Because defendants did not meet their burden to establish part C, summary adjudication is inappropriate for Garcia's wage order claims. The moving papers did not establish that Garcia "is customarily engaged in an independently established trade, occupation, or business." ( Dynamex, supra, 4 Cal.5th at p. 963, 232 Cal.Rptr.3d 1, 416 P.3d 1 ; see Affordable Cabs, Inc. v. Department of Employment Sec. (2004) 124 Wash.App. 361, 101 P.3d 440, 445 [taxi driver was employee under part C because he had not "solicited, advertised, or otherwise held himself out to the community as being in a separate business"; had not "established himself as a separate business"; "did not own his taxi, records, or customer lists; have a special business license; or have anything else indicative of an independent business"; and "could not continue his business after leaving ACI"].)
Accordingly, summary adjudication is improper as to the wage order claims-the second cause of action for unpaid wages, third cause of action for failure to pay minimum wage, fifth cause of action for failure to provide meal and rest breaks, sixth cause of action for failure to furnish itemized wage statements, and eighth cause of action for UCL claims related to the foregoing claims.
5. Garcia forfeited review as to his non-wage-order claims.***
*576 DISPOSITION
The judgment is reversed. The matter is remanded with instructions that the trial court vacate its order granting summary judgment and enter a new order granting summary adjudication as to Garcia's non-wage-order claims (causes of action 1, 4, 7, and 8 to the extent resting on the foregoing) and denying summary adjudication as to the wage order claims (causes of action 2, 3, 5, 6, and 8 to the extent resting on the foregoing). Each side shall bear its costs on appeal.
WE CONCUR:
HALLER, Acting P. J.
GUERRERO, J.

At issue in Dynamex and this case is Wage Order No. 9, which applies to "all persons employed in the transportation industry." (Cal. Code Regs., tit. 8, § 11090, subd. 1.) We discuss state wage orders in greater detail in the discussion.

"The pleadings define the issues to be considered on a motion for summary judgment. [Citation.] As to each claim as framed by the complaint, the defendant must present facts to negate an essential element or to establish a defense." (Ferrari v. Grand Canyon Dories (1995) 32 Cal.App.4th 248, 252, 38 Cal.Rptr.2d 65.) Garcia's complaint omits key factual allegations as to when he started working for BTG and the factual premise for his wage and hour claims. The trial court was right in stating it consists of mere "legal conclusions." Because defendants requested summary judgment, not judgment on the pleadings or demurrer, defects in the complaint are not before us. We draw relevant facts in this section from the parties' summary judgment papers solely to provide context for our analysis.

In other locales, taxi vehicle permits are sometimes called "medallions." (See, e.g., Sebago v. Boston Cab Dispatch, Inc. (2015) 471 Mass. 321, 28 N.E.3d 1139, 1143 (Sebago ).)

Because they share a last name, we refer to Erik Ortega and Martha Ortega by their first names and intend no disrespect.

There are just two factual allegations in the complaint-Garcia left BTG in April 2014, and his claims accrued "[o]ver the past four years." It is not clear whether this means four years before Garcia filed his complaint or four years before he left BTG. Generously construed, on summary judgment Garcia's wage order claims are limited to the April 2010 to April 2014 period. Accordingly, we need not address defendants' contention, raised below and on appeal, that any claims preceding January 1, 2009, were discharged in bankruptcy proceedings.

To avoid repetition, we discuss facts pertinent to the court's denial of Garcia's continuance request and its exclusion of his late-filed separate statement in nonpublished portions of the discussion section.

Further statutory references are to the Code of Civil Procedure unless otherwise indicated.

See footnote *, ante .

"The definitions of 'employ,' 'employee,' and 'employer' that appear in subdivision 2 of the transportation industry wage order are also included in the definitions set forth in each of the other 15 wage orders governing other industries in California, although several of the other industry wage orders include additional definitions of the term 'employee.' " (Dynamex, supra, 4 Cal.5th at p. 926, fn. 9, 232 Cal.Rptr.3d 1, 416 P.3d 1.)

The court did not address what standard applies to non- wage-order claims. (Dynamex, supra, 4 Cal.5th at pp. 916, fn. 5 & 925, 232 Cal.Rptr.3d 1, 416 P.3d 1.)

Appreciating "the primacy of statutory purpose in resolving the employee or independent contractor question" (Dynamex, supra, 4 Cal.5th at p. 948, 232 Cal.Rptr.3d 1, 416 P.3d 1 ), we express no opinion on the appropriate test on different records in other situations.

Generally, "judicial decisions are given retroactive effect." (Newman v. Emerson Radio Corp. (1989) 48 Cal.3d 973, 978, 258 Cal.Rptr. 592, 772 P.2d 1059 (Newman ).) But the rule of retroactivity is not "absolute." (Ibid. ) "A court may decline to follow the standard rule when retroactive application of a decision would raise substantial concerns about the effects of the new rule on the general administration of justice, or would unfairly undermine the reasonable reliance of parties on the previously existing state of the law." (Id. at p. 983, 258 Cal.Rptr. 592, 772 P.2d 1059.) In their supplemental brief discussing the impact of Dynamex , defendants implicitly assume retroactivity, and we therefore do not address that issue today. (In re Retirement Cases (2003) 110 Cal.App.4th 426, 443, 1 Cal.Rptr.3d 790 [party arguing nonretroactivity bears the burden of proof].)
As an academic point, we observe that Dynamex applied the ABC test to the class certification question before it, and the Supreme Court denied later requests to modify the opinion to apply the ABC test only prospectively. Moreover, to the extent Dynamex merely extended principles stated in Borello and Martinez , it represented "no greater 'surprise' " than tort decisions that routinely apply retroactively. (Newman, supra, 48 Cal.3d at p. 984, 258 Cal.Rptr. 592, 772 P.2d 1059 ; see Waller v. Truck Ins. Exchange, Inc. (1995) 11 Cal.4th 1, 25, 44 Cal.Rptr.2d 370, 900 P.2d 619 [rejecting argument that judicial decision was "unforeseeable," precluding retroactive application, where it "was but a logical extension" of previously established principles].)

For the first time in their petition for rehearing defendants attempt to argue that under a "totality of the circumstances" test (see Kirby, supra, 176 A.3d at p. 1188 ), factors other than the actual performance of similar work for other parties show that Garcia was an independent contractor rather than an employee. Most of this argument merely rehashes the "control" evidence defendants previously submitted to support the inapplicable Borello test, such as BTG's lack of training or supervision or Garcia's retention of fares. Defendants' suggestion that Garcia's taxicab amounts to an independent place of business akin to a "home office" is patently unpersuasive-Garcia made lease payments at BTG's office and had no separate business address. As to their reference to business cards, Garcia testified that BTG provided him with business cards; he could not advertise his services as "Garcia Taxicab" or the like; he opted to list his cell phone number on the cards alongside two numbers for the company; and he did not advertise his business in the Yellow Pages, newspaper, or any other source. Although Garcia had a city-issued permit, it was specific as to BTG. (Calexico Mun. Code, ch. 5.80, § 5.80.140.) BTG admits it provided third party liability insurance, and Garcia's ability to procure additional coverage does not show he is customarily engaged in an independently established business. Although Garcia did operate his own vehicle for a time, he purchased that vehicle from Martha Ortega, the former sole proprietor of Calexico Taxi, and operated it as a Calexico Taxi with BTG's vehicle permit. He then leased a vehicle from BTG starting in August 2013 when his own vehicle became inoperable.

See footnote *, ante .