Filed 9/30/21  Barajas v. Ortiz-Nance CA5

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| NORMA BARAJAS,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>EDWYN ORTIZ-NANCE et al.,<br><br>Defendants and Respondents. | F079179<br><br>(Super. Ct. No. VCU272718)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Bret D. Hillman, Judge.

Law Office of Peter Sean Bradley and Peter Sean Bradley for Plaintiff and Appellant.

Michael L. Schulte; Farley Law Firm, Michael L. Farley, and Joseph Beery for Defendants and Respondents.

-ooOoo-

Dr. Norma Barajas (plaintiff) holds a Ph.D. in educational psychology.  Several years after obtaining her doctorate, plaintiff endeavored to become a licensed clinical psychologist.  The licensure requirements included 3,000 hours of providing direct mental health services to patients.  To satisfy this requirement, plaintiff entered into

contractual agreements with Edwyn Ortiz-Nance, Psy.D. (Dr. Ortiz-Nance), and Synchrony of Visalia, Inc. (Synchrony) (collectively, defendants).

Plaintiff registered with the state as a psychological assistant, which allowed her to treat patients in a clinical setting under Dr. Ortiz-Nance's supervision. In this context, "supervision" does not mean direct observation of the assistant's treatment of patients. Under her arrangements with defendants, plaintiff was entitled to 50 to 70 percent of the revenue generated by her services. She accrued 3,600 hours of qualifying experience over a three-year period, but her earnings totaled less than $14,000. Put differently, she was ultimately paid less than $4 per hour. Plaintiff contends she also worked additional hours that did not count toward her licensure requirements and for which she received no compensation.

After parting ways with defendants, plaintiff successfully filed a claim with the California Department of Industrial Relations, Division of Labor Standards Enforcement (DLSE) and was awarded over $72,000. Defendants challenged the award in the Tulare Superior Court. The superior court found the parties did not have an employer/employee relationship, and it ruled against plaintiff on all claims. This appeal is taken from a judgment entered in favor of defendants.

The trial court relied on federal decisional authority to determine the legal nature of the parties' relationships. However, plaintiff's claims were made under California law. She correctly argues those claims are governed by California Supreme Court precedent. We reverse the judgment and remand for further proceedings, which shall include the trial court's analysis of the claims under the controlling legal standards.

## FACTUAL AND PROCEDURAL BACKGROUND

*Procedural History*

According to the judgment, plaintiff filed a claim with the DLSE on March 31, 2017, regarding her work with Dr. Ortiz-Nance. The claim "was converted to a formal complaint on August 1, 2017," at which point Synchrony was named as an additional

defendant. The record on appeal omits the complaint and contains no documents from the DLSE proceedings. The judgment states plaintiff "sought compensation for unpaid contractual wages, unpaid minimum wages, liquidated damages, California Labor Code §260 damages, waiting time penalties, unreimbursed business expenses, and attorney's fees."[1]

In January 2018, the Labor Commissioner ruled for plaintiff and awarded her $72,377. Defendants, acting pursuant to Labor Code section 98.2, posted a bond and appealed the decision to the Tulare Superior Court. Plaintiff later pleaded additional claims alleging (1) entitlement to restitution for unspecified violations of Business and Professions Code section 17200 (also known as the unfair competition law or UCL); (2) penalties under Labor Code section 226 for failure to provide itemized pay statements; and (3) penalties for failure to maintain records as required by Labor Code section 1174.[2]

A six-day bench trial was conducted in March 2019. The trial court admitted 35 exhibits and heard testimony from six witnesses, including plaintiff and Dr. Ortiz-Nance. Following the presentation of evidence, the parties were ordered to submit closing briefs. Prior to the filing deadline, the trial court "withdr[ew] its request for supplemental briefing" and issued a written tentative decision. The tentative decision was incorporated

---

[1]The parties have elected to proceed with appellant's and respondents' appendices in lieu of a clerk's transcript. (Cal. Rules of Court, rule 8.124.) The appendices primarily consist of exhibits from a bench trial in the superior court. The record further omits pleadings, trial briefs, and other materials that would have helped this court to understand the exact legal basis for each of plaintiff's claims and the parties' respective theories of the case.

[2]Although statutorily described as "an appeal to the superior court," proceedings under Labor Code section 98.2 are de novo. (*Id*., subd. (a).) "The decision of the commissioner is 'entitled to no weight whatsoever, and the proceedings are truly "a trial anew in the fullest sense."'" (*Post v. Palo/Haklar & Associates* (2000) 23 Cal.4th 942, 948.) Trial courts have discretion to hear "additional related wage claims in the de novo trial that were not first considered by the Labor Commissioner." (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1116.) "'The decision of the trial court, after de novo hearing, is subject to a conventional appeal to an appropriate appellate court.'" (*Ibid.*, quoting *Post, supra*, at p. 948.)

by reference into the final judgment, which was entered in April 2019. This timely appeal followed, but the appellate briefing was not completed until March 2021.

***Trial Evidence***

In 2006, plaintiff received a Ph.D. in educational psychology from a midwestern university. Plaintiff testified her training was in "research and statistics" but not clinical work, i.e., "not the actual treatment and assessment" of patients. In 2011, she began taking steps toward becoming a licensed clinical psychologist in California. Plaintiff enrolled in a "respecialization program" at Alliant International University (Alliant) in Fresno, taking courses in "forensic and clinical psychology."

While attending Alliant, plaintiff became acquainted with Dr. Ortiz-Nance in his capacity as the school's practicum "placement officer." Dr. Ortiz-Nance also worked in private practice at offices in Fresno and Visalia. A practicum is "a course of study designed especially for the preparation of teachers and clinicians that involves the supervised practical application of previously studied theory." (Merriam-Webster Dict. Online <https://www.merriam-webster.com/dictionary/practicum> [as of Sept. 29, 2021].) Dr. Ortiz-Nance supervised plaintiff as part of a practicum in 2011, but her practicum work is not at issue in this case.

In late 2011, plaintiff discovered she did not need to attend Alliant in order to become a licensed clinician. She testified to withdrawing from the university prior to 2012 and getting "reimbursed for the practicum course." Around the same general time period, Dr. Ortiz-Nance offered plaintiff a job.

As generally explained in witness testimony, the Psychology Licensing Law (Bus. & Prof. Code, § 2900 et seq.) requires prospective licensees to have "at least two years [of] supervised professional experience [(SPE)] under the direction of a licensed psychologist." (*Id*., § 2914, subd. (d)(1); *Brown v. County of Los Angeles* (2012) 203 Cal.App.4th 1529, 1540.) The regulations of the California Board of Psychology (CBP) provide: "One year of SPE shall be defined as 1500 hours. At least one year of SPE

4.

shall be completed postdoctorally. … If both years of SPE (3000 hours) are completed postdoctorally, they shall be completed within a sixty (60) month period." (Cal. Code Regs., tit. 16, § 1387, subd. (a).)

One of several ways to meet the SPE requirement is to register with the CBP as a "psychological assistant" and work under the supervision of a licensed psychologist. (Bus. & Prof. Code, § 2913; Cal. Code Regs., tit. 16, § 1387, subd. (a)(2)(D).) The registration must be renewed annually. (Bus. & Prof. Code, § 2913, subd. (a).) CBP regulations use the term "trainee" in reference to both predoctoral and postdoctoral psychological assistants. (Cal. Code Regs., tit. 16, § 1387.) "Trainees shall be provided with supervision for 10% of the total time worked each week. At least one hour per week shall be face-to-face, direct, individual supervision with the primary supervisor." (*Id.*, subd. (b)(4).)

By 2012, the parties had filed the necessary paperwork with the CBP for plaintiff to become registered as Dr. Ortiz-Nance's psychological assistant. The documents included a preprinted CBP form entitled "Application to Employ A Psychological Assistant (Pursuant to Section 2913 of the Business and Professions Code)." (Some capitalization omitted.) The form included sections requiring identification of the "employer" and "supervisor." Dr. Ortiz-Nance's contact information and signature was provided in both of those sections, and he also signed the last page of the form in a space requesting the "Signature of Employer." The significance of the form's reference to Business and Professions Code section 2913 is discussed *post*.

Another section of the application asked for a description of "the supervision to be provided to the psychological assistant." Dr. Ortiz-Nance wrote, "Supervision will be weekly for two hours (minimum). One hour weekly of direct face to face and one (or more) hour(s) weekly in clinical staff meeting. Additional supervision may be provided for special circumstances …."

5.

Plaintiff and Dr. Ortiz-Nance also submitted to the CBP a form entitled, "Supervision Agreement for Supervised Professional Experience." (Boldface and some capitalization omitted.) This document indicated plaintiff would be working at two locations: "(1) Synchrony … [and] (2) E.W. Ortiz-Nance, Psy.D. Psychological Services @ The Centre for Harmony …."

Synchrony is a nonprofit corporation operating out of a commercial location in Visalia. According to defense witnesses, it is a "referral agency," i.e., it refers people seeking psychological treatment to clinicians who work in its offices. Some of the clinicians are licensed and others are unlicensed trainees working under supervision, which basically means they have regular meetings with a licensed supervisor to discuss their caseload; their documentation (e.g., reports, correspondence) is subject to review and approval. Dr. Ortiz-Nance explained, "[I]f a trainee is in with a patient, that door is closed. … I cannot just go in and say, what's going on here. There is a level of confidentiality. I only know what they represent either in their progress notes or what they tell me during supervision."

Defense witnesses testified Synchrony is also a "teaching clinic." However, Synchrony views all clinicians who work there—licensed or unlicensed—as "revenue generators." As one witness explained, Synchrony's operating budget is dependent upon the revenue generated by the clinicians:

> "So when clinicians come in, whether licensed, whatever they're at, because we're a nonprof[it] there has to be a way of being able to keep our doors open. And that is the discussion they have at the beginning before they sign on to come on with us is that it costs money to have lights, to have front office staff, to bill out. There is an expense to that. We are a business. And so if clinicians didn't match that, our business would fail. We wouldn't be there. We wouldn't be able to keep our doors open."

Synchrony maintains that no one who treats patients at its facility is an employee. It employs only a small number of "front office staff" who provide administrative support, e.g., patient scheduling and billing. Although Dr. Ortiz-Nance has at times

6.

identified himself as Synchrony's "Director of Clinical Training" and used similar variations of that title, defense witnesses testified he was neither an employee of the corporation nor part of its governing board.

At trial, plaintiff's counsel indicated all claims were based on work performed during the years 2013, 2014, and 2015. However, plaintiff did rely on a written "Agency Agreement" for "Post-doctoral/Non-licensed psychologists" dated June 1, 2012. (Boldface and some capitalization omitted.) The contract was entered into between plaintiff, Synchrony, and Dr. Ortiz-Nance in his stated capacity as "Director of Clinical Training" and Synchrony's "designee." Plaintiff agreed to provide, "on behalf of and/or at the direction of [Synchrony]," a range of specified "therapeutic services/duties to [Synchrony's] clients by assignment of those clients (as agreed upon) to [plaintiff]."

The agency agreement further stated: "As compensation for the services to be rendered by [Synchrony] under this agreement[,] [plaintiff] and [Synchrony] agree to a 50% ([plaintiff]) 50% ([Synchrony]) division of income for each client seen or billable incident." The defense argued this wording meant plaintiff had agreed to compensate Synchrony for services it provided to her, e.g., patient referrals and billing. Dr. Ortiz-Nance testified the "division of income" language meant the parties were only entitled to a percentage of the money *collected* from the patient and/or the patient's insurance provider, not the amount billed.

At Synchrony, insured patients were billed $110 per hour and uninsured patients were billed on a sliding scale of approximately $20–$40 per hour. A Form W-2 Wage and Tax Statement issued by Synchrony to plaintiff for the year 2013 indicated plaintiff was paid $9,886 (rounded) for her work during the relevant time period. Plaintiff testified she stopped treating patients at Synchrony in December 2013.

During 2014 and 2015 (and allegedly in 2013 as well), plaintiff treated patients at the Centre For Harmony (Harmony) in Fresno. Harmony is a commercial building reportedly owned by a church. The church leases office space to a variety of health and

7.

wellness practitioners.  For example, according to the testimony, "at one point there was an acupuncturist there, a shaman there, a craniosacral therapist there."

Dr. Ortiz-Nance leased an office at Harmony and ran his private practice from there in person on days when he was not working at Synchrony.  There was conflicting testimony as to whether he also leased a second office at Harmony during the relevant time period.  According to the defense, the leased space allowed for only one clinician at a time and was used by different people on different days.

The number of hours plaintiff claimed to have worked at Harmony was disputed.  Likewise, whereas plaintiff claimed the patients she treated at Harmony were assigned to her by Dr. Ortiz-Nance, the defense argued plaintiff independently developed her own clientele.  Plaintiff did her own billing at Harmony, which differed from the procedures at Synchrony.  As summarized in the judgment, "there were significant evidentiary disputes about what hours she worked, where she worked those hours, if the hours kept [i.e., documented] were accurate, if she received improper compensation for work done by others, if copays were properly accounted for and whether clients were improperly billed."

Plaintiff and Dr. Ortiz-Nance had a written revenue-sharing agreement that was similar to her arrangement with Synchrony.  The main difference was the split.  Plaintiff was entitled to 70 percent of the revenue generated by her work at Harmony; the remaining 30 percent went to Dr. Ortiz-Nance.  Dr. Ortiz-Nance provided plaintiff with earning statements for 2014 and 2015 using IRS Form 1099-MISC, which indicated her "Nonemployee compensation" for those years was $1,302 and $2,296 (rounded), respectively.  Plaintiff claimed to have worked approximately 580 hours at Harmony in 2014 and 300 hours in 2015, spending most of that time treating insured patients who were billed $130 per hour/visit.

In July 2015, Dr. Ortiz-Nance signed a CBP "Verification of Experience Form" attesting plaintiff had completed 3,600 SPE hours between February 6, 2012, and the

8.

completion date of January 30, 2015.  (Some capitalization omitted.)  The record does not clearly explain why the form was signed nearly six months after the completion date. Plaintiff claimed she continued seeing patients at Harmony through July 2015 despite having completed her SPE hours and receiving only paltry compensation.  She testified it was because she "liked working with the patients" and "needed the structure" in her life.

In approximately July or August 2015, plaintiff took a new job working as a psychological assistant for a third party not involved in this case.  According to her testimony, the position paid a fixed rate of $45 per hour (i.e., regardless of any shortfalls in the amounts collected from patients and/or their insurance providers).  At trial in March 2019, plaintiff described her current occupation as that of "an unlicensed clinical psychologist."

### Trial Court's Findings and Conclusions

Plaintiff argued the issue of whether she was an employee of Dr. Ortiz-Nance and/or Synchrony was governed by the California Supreme Court's opinion in *Dynamex Operations West*, *Inc. v. Superior Court* (2018) 4 Cal.5th 903 (*Dynamex*).  Defense counsel urged the trial court to instead apply a seven-factor test used by federal courts in cases such as *Benjamin v. B & H Educ.*, *Inc.* (9th Cir. 2017) 877 F.3d 1139 (*Benjamin*). In the alternative, defendants argued "that even under the *Dynamex* test plaintiff [was] not an employee."

The trial court relied exclusively on federal case law, and *Benjamin* in particular. It also discussed *Schumann v. Collier Anesthesia*, *P.A.* (11th Cir. 2015) 803 F.3d 1199 and briefly mentioned *Solis v. Laurelbrook Sanitarium & Sch.*, *Inc.* (6th Cir. 2011) 642 F.3d 518.  In the following excerpt from its written decision, the trial court made findings relative to the "primary beneficiary test" described in *Benjamin*, *supra*, 877 F.3d at pages 1143–1146.  The trial court used italics to identify the seven factors.

> "*1.  The extent to which the intern and the employer clearly understand that there is no expectation of compensation.  Any promise of*

9.

*compensation, express or implied, suggests that the intern is an employee—and vice versa.*

"Here, there was an agreement for compensation. Although the parties had significant disputes about what should have been paid, this court cannot find based on the evidence presented at trial, that [plaintiff] was paid less than the agreed amount for her services.

"*2. The extent to which the internship provides training that would be similar to that which would be given in an educational environment, including the clinical and other hands-on training provided by educational institutions.*

"The program in the case at bar was by definition a clinical program, allowing for direct supervision, group supervisions, and direct patient contact, both in individual and group settings. It was a mandatory part of the educational process to become a licensed psychologist.

"*3. The extent to which the internship is tied to the intern's formal education program by integrated coursework or the receipt of academic credit.*

"Again, [plaintiff] could not sit for her licensing examination without 3000 SPE hours. Although many interns and practicum students worked in the clinic as part of their course work, here the CBP had determined that, as the holder of a doctoral degree, [plaintiff] needed no additional coursework, but was required to complete the SPE hours.

"*4. The extent to which the internship accommodates the intern's academic commitments by corresponding to the academic calendar.*

"As noted above, [plaintiff] had completed her coursework as a post-doc, so she was not tied to an academic year, but it certainly accommodated her academic commitments as it fulfilled the last requirement before the licensing exam.

"*5. The extent to which the internship's duration is limited to the period in which the internship provides the intern with beneficial learning.*

"Here, the internship commenced to allow [plaintiff] to complete her SPE hours, and she resigned within weeks of documenting the necessary hours and submitting them to the CBP. No one disputed the value of the training or experience obtained by [plaintiff], or that it allowed her to transition from a background in educational psychology, which she testified

had little similarity to clinical practice, into a clinical setting where she continues to work to this day.

"*6. The extent to which the intern's work complements, rather than displaces, the work of paid employees while providing significant educational benefits to the intern.*

"There was no evidence produced of [plaintiff] displacing any other workers. In fact, Synchrony was described as 'a teaching clinic' throughout the trial and there was evidence that practicum students and interns worked there regularly. Although other professionals worked in the clinic, the constraints discussed were related to a shortage of office space at both Synchrony and [Harmony], not that employees were being displaced. Dr. Ortiz-Nance had no employees at [Harmony] and the employees at Synchrony were office staff rather than clinical practitioners. To the extent [plaintiff] performed administrative tasks, it did not displace other employees.

"*7. The extent to which the intern and the employer understand that the internship is conducted without entitlement to a paid job at the conclusion of the internship.*

"There was no evidence produced at trial that [plaintiff] expected to work at Synchrony or [Harmony] after completing her SPE hours. In fact, she had sought and obtained more remunerative employment elsewhere, which began the month after she left [Harmony]."[3]

The trial court further stated: "[T]he *Benjamin* court concluded that in making such determinations the court should follow the federal Fair Labor Standards Act to determine the 'primary beneficiary' of the labor relationship. This court finds that [plaintiff] was the primary beneficiary of the relationship …." The trial court's final analysis of the worker classification issue was as follows: "Considering the relevant case law, the evidence and the factors noted above, the court concludes that [plaintiff] was not an employee of Synchrony or Dr. Ortiz-Nance. The court finds she was paid

---

[3]The trial court's ruling says "the month after she left Synchrony," but it was undisputed plaintiff ceased working at Synchrony in 2013. She testified to starting her new psychological assistant job in 2015, within weeks of discontinuing her work at Harmony.

appropriately for the services as agreed between the parties and is not entitled to additional compensation."

## DISCUSSION

A trial court errs by failing to apply the correct legal standard governing an issue under its consideration. (*Fox Factory*, *Inc. v. Superior Court* (2017) 11 Cal.App.5th 197, 207.) "[S]election of the applicable law" is a legal issue subject to de novo review. (*Apex LLC v. Sharing World*, *Inc.* (2012) 206 Cal.App.4th 999, 1009.) We must ultimately determine whether plaintiff's claims are governed by the federal authorities upon which the trial court relied.

"California law governing wages, hours, and working conditions is embodied, to a large extent, in Labor Code section 1171 et seq. and the regulations (wage orders) promulgated by the Industrial Welfare Commission (IWC). The Fair Labor Standards Act of 1938 (FLSA; 29 U.S.C. § 201 et seq.) is the federal counterpart." (*United Parcel Service Wage & Hour Cases* (2010) 190 Cal.App.4th 1001, 1009, fn. omitted.) "The FLSA does not preempt state law and 'explicitly permits greater employee protection under state law.' [Citation.] In many respects, California law provides broader protection of employee rights, and in such instances, California law controls." (*Id.* at p. 1010; accord, *Alvarado v. Dart Container Corp. of California* (2018) 4 Cal.5th 542, 554 ["state law is controlling to the extent it is more protective of workers than federal law"].)

"California wage orders are intended to provide broader protection than that accorded workers under the federal standard." (*Dynamex*, *supra*, 4 Cal.5th at p. 956.) As such, "wage orders issued by the IWC 'do not incorporate the federal definition of employment' under the FLSA." (*Futrell v. Payday California*, *Inc.* (2010) 190 Cal.App.4th 1419, 1423, quoting *Martinez v. Combs* (2010) 49 Cal.4th 35, 52, 66–68.) "Today 18 wage orders are in effect, 16 covering specific industries and occupations, one covering all employees not covered by an industry or occupation order, and a general

12.

minimum wage order amending all others to conform to the amount of the minimum wage currently set by statute." (*Martinez*, at p. 57, fns. omitted.)

The legal basis for each of plaintiff's claims is not entirely clear from the record, but some claims are necessarily based on alleged violations of one or more IWC wage orders. We know this because the judgment refers to a claim for "unpaid minimum wages," and certain documents show plaintiff's reliance upon Labor Code section 1194.[4] "[A] claim under [Labor Code] section 1194 is in reality a claim under the applicable wage order and thus subject to the order's definitional provisions." (*Martinez v. Combs*, *supra*, 49 Cal.4th at p. 63.)

In *Dynamex*, the California Supreme Court announced a new legal standard ("the ABC test") for determining whether workers are employees for purposes of claims based on IWC wage orders. (*Dynamex*, *supra*, 4 Cal.5th at pp. 956–957.) "The ABC test presumptively considers all workers to be employees, and permits workers to be classified as independent contractors only if the hiring business demonstrates that the worker in question satisfies *each* of three conditions: (a) that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and* (b) that the worker performs work that is outside the usual course of the hiring entity's business; *and* (c) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed." (*Id*. at pp. 955–956.)

In *Vazquez v. Jan-Pro Franchising Internat., Inc.* (2021) 10 Cal.5th 944, the California Supreme Court held "the standard set forth in *Dynamex* applies retroactively—

---

[4]Labor Code section 1194, subdivision (a) provides: "Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorney's fees, and costs of suit."

that is, to all cases not yet final as of the date [its] decision in *Dynamex* became final." (*Vazquez*, at p. 948.)  The opinion notes the issue in *Dynamex* was "what standard applies in determining whether, for purposes of the obligations imposed by California's wage orders, a worker should be considered *an employee* who is covered and protected by the applicable wage order or, instead, *an independent contractor* to whom the wage order's obligations and protections do not apply." (*Id.* at pp. 949–950.)  The *Dynamex* opinion was issued in April 2018, i.e., after the filing of plaintiff's claims and prior to the trial.

Before *Dynamex*, the prevailing standard under California law was a multifactor test set forth in *S.G. Borello & Sons*, *Inc. v. Dept. of Industrial Relations* (1989) 48 Cal.3d 341 (*Borello*), which "applied common law analysis of the critical issue of control of the purported employees' work." (*Messenger Courier Assn. of Americas v. California Unemployment Ins. Appeals Bd*. (2009) 175 Cal.App.4th 1074, 1081; see *Dynamex*, *supra*, 4 Cal.5th at p. 929 [stating *Borello* had "come to be viewed as the seminal California decision on this subject"].)  As noted in *Garcia v. Border Transportation Group*, *LLC* (2018) 28 Cal.App.5th 558 (*Garcia*), "'*Dynamex* did not purport to replace the *Borello* standard in every instance where a worker must be classified as either an independent contractor or an employee for purposes of enforcing California's labor protections.' [Citation.]  To the contrary, the Supreme Court recognized that different standards could apply to different statutory claims."[5]  (*Garcia*, at p. 570.)

_____

[5]As further explained in *Garcia*, the *Dynamex* case also involved "*non*-wage-order claims, such as claims for reimbursement of [expenditures] under Labor Code section 2802" (*Garcia*, *supra*, 28 Cal.App.5th at p. 571), but the California Supreme Court did not decide what standard governs claims based upon "statutory obligations that do not derive directly from the applicable wage order" (*Dynamex*, *supra*, 4 Cal.5th at p. 942).  "It did not reject *Borello*, … [n]or did it address the appellate court's ruling that 'insofar as the causes of action in the complaint … are not governed by the wage order' and predicated solely on the Labor Code, 'the *Borello* standard is the applicable standard for determining whether a worker is properly considered an employee or an independent contractor.'" (*Garcia*, *supra*, at p. 571, quoting *Dynamex*, at p. 915.)

In the immediate wake of the *Dynamex* decision, "several Courts of Appeal decided that the *Borello* standard rather than the ABC test should apply to claims under the Labor Code that are not based upon wage order violations." (*Parada v. East Coast Transport Inc.* (2021) 62 Cal.App.5th 692, 699, fn. 2.) In *Garcia*, for example, the appellate court concluded most of the plaintiff's causes of action were governed by *Dynamex* but held the "test articulated in *Borello*" applied to certain claims that "[did] not arise under the [applicable] wage order." (*Garcia*, *supra*, 28 Cal.App.5th at pp. 571–572.) Similarly, in *Gonzales v. San Gabriel Transit, Inc*. (2019) 40 Cal.App.5th 1131, the appellate court held "the ABC test applies to Labor Code claims which are either rooted in one or more wage orders, or predicated on conduct alleged to have violated a wage order. As to Labor Code claims that are not either rooted in one or more wage orders, or predicated on conduct alleged to have violated a wage order, the *Borello* test remains appropriate." (*Id.* at p. 1157.)

Effective September 4, 2020, by enactment of Labor Code section 2775, the ABC test articulated in *Dynamex* applies to all claims under the Labor Code and Unemployment Insurance Code, and "for the purposes of wage orders of the Industrial Welfare Commission." (Lab. Code, § 2775, subd. (b)(1); Stats. 2020, ch. 38, § 2.) "[Labor Code s]ection 2775 does not constitute a change in, but is declaratory of, existing law with regard to wage orders of the Industrial Welfare Commission and violations of [the Labor Code] *relating to wage orders*." (Lab. Code, § 2785, subd. (a), italics added.)

Pursuant to provisions enacted in Labor Code sections 2776 through 2784, numerous exceptions provide for application of the *Borello* test rather than the *Dynamex* test to determine whether a person providing labor or services for remuneration should be classified as an employee or an independent contractor. "Insofar as the application of Sections 2776 to Section 2784 would relieve an employer from liability, those sections shall apply retroactively to existing claims and actions to the maximum extent permitted by law." (Lab. Code, § 2785, subd. (b).) "Except as provided in subdivisions (a) and (b)

15.

of [Labor Code section 2785]," the new statutes "apply to work performed on or after January 1, 2020." (*Id.*, subd. (c).)

The federal "primary beneficiary test" relied upon by the trial court does not apply to this case. (See further discussion, *post.*) Although it appears *Dynamex* applies to most of plaintiff's claims, the incomplete record suggests it is possible one or more claims may be governed by *Borello*. For example, the tentative decision and judgment both confusingly indicate plaintiff sought damages under Labor Code section 260, which is a nonexistent statute. It would appear there was a distinct claim based on a Labor Code statute, but it could not have been section 260.

Even if we were certain all of plaintiff's claims are governed by *Dynamex*, the trial court made limited factual findings tailored to an inapplicable legal standard. In analogous situations, given the "highly factual" nature of worker classification disputes, appellate courts have reversed and ordered further proceedings on remand. (*Parada v. East Coast Transport Inc.*, *supra*, 62 Cal.App.5th at p. 703; see *ibid.* ["we conclude that the best course is to permit the trial court to consider in the first instance whether [a]ppellants were independent contractors under the ABC test"]; *Gonzales v. San Gabriel Transit*, *Inc.*, *supra*, 40 Cal.App.5th at p. 1160 ["We remand this action to the trial court to conduct further proceedings as necessary to consider these issues, recognizing that the parties' arguments … were not framed with the ABC test in mind, and they may have proceeded on a different evidentiary record"].) We take the same approach here.

> "On remand, the trial court shall: (1) evaluate which alleged Labor Code claims enforce wage order requirements, and which do not; (2) as to the Labor Code claims that enforce wage order requirements, apply the ABC test as set forth in *Dynamex* …; (3) as to [claims not based upon or related to the enforcement of wage order requirements, or any claims subject to the provisions of Labor Code sections 2776 through 2784], apply the *Borello* test …; [and] (4) as to the derivative claim under [Business and Professions Code] section 17200, apply the ABC or *Borello* test as appropriate for the underlying alleged unlawful business practice."
> (*Gonzales v. San Gabriel Transit, Inc.*, *supra*, 40 Cal.App.5th at p. 1141.)

Although plaintiff reportedly "sought compensation for unpaid contractual wages," the record does not identify the contracts at issue or the theories of relief upon which she relied. Multiple written agreements were discussed at trial, some of which are not included in the record. The disposition is not meant to suggest any express or implied factual findings regarding the parties' contractual performance were erroneous. We express no opinion as to who should prevail on any cause of action.

In her opening brief, plaintiff requested a retrial. In her reply brief, she contends "[the] judgment must be reversed for further proceedings." Although a full retrial is unwarranted, the trial court is not precluded from conducting further evidentiary proceedings as may be necessary to make supplemental findings. For guidance on remand, we now address in greater detail the parties' legal contentions and the applicable law.

### A. Federal Cases

The trial court relied on three federal appellate decisions. In their briefing, defendants additionally cite *Walling v. Portland Terminal Co*. (1947) 330 U.S. 148 (*Portland Terminal*) and *Glatt v. Fox Searchlight Pictures*, *Inc*. (2d Cir. 2016) 811 F.3d 528. We discuss these cases in chronological order.

In *Portland Terminal*, a railroad company had for many years "given a course of practical training to prospective yard brakemen." (*Portland Terminal*, *supra*, 330 U.S. at p. 149.) Completion of the course, "the average length of which [was] seven or eight days," was a prerequisite to obtaining employment with the company but such employment was not guaranteed. (*Ibid.*) Notwithstanding a special wartime policy authorizing a "retroactive allowance of $4 per day" for certain groups, trainees received no payment for their participation in the course. (*Id*. at p. 150.)

The United States Department of Labor alleged FLSA violations, including failure to pay minimum wages. (*Portland Terminal*, *supra*, 330 U.S. at p. 149.) The United

States Supreme Court ruled in favor of the railroad, concluding the FLSA's definitions of "'employ'" and of "'employee'" were not so broad "as to make a person whose work serves only his own interest an employee of another person who gives him aid and instruction." (*Portland Terminal*, at p. 152.) The opinion noted the FLSA "covers trainees, beginners, apprentices, or learners if they are employed to work for an employer for compensation" (*Portland Terminal*, at p. 151), but there were no findings "that the railroad ever undertook to pay, or the trainees ever expected to receive, any remuneration for the training period other than the contingent allowance" (*id*. at p. 150).

In *Solis v. Laurelbrook Sanitarium & Sch.*, *Inc*., *supra*, 642 F.3d 518 (*Solis*), the defendant owned and operated a religious boarding school and a "50-bed intermediate-care nursing home." (*Id*. at p. 520.) The school's curriculum had a "practical training component" that required students to work at the nursing home without receiving financial compensation. (*Id*. at pp. 520–521.) The lawsuit arose from an investigation into possible violations of the child labor provisions of the FLSA. (*Solis*, at p. 519.)

The issue before the United States Court of Appeals for the Sixth Circuit was "whether the district court erred in concluding that [the] students … [were] not employees under the FLSA." (*Solis*, *supra*, 642 F.3d at p. 521.) Relying on *Portland Terminal*, the Sixth Circuit concluded "that a primary benefit test provides a helpful framework for discerning employee status in learning or training situations. By focusing on the benefits flowing to each party, the test readily captures the distinction the FLSA attempts to make between trainees and employees." (*Solis*, at p. 529.)

The *Solis* opinion holds, in relevant part, "that the proper approach for determining whether an employment relationship exists in the context of a training or learning situation is to ascertain which party derives the primary benefit from the relationship. Factors such as whether the relationship displaces paid employees and whether there is educational value derived from the relationship are relevant considerations that can guide the inquiry." (*Solis*, *supra*, 642 F.3d at p. 529.)

In *Glatt v. Fox Searchlight Pictures*, *Inc*., *supra*, 811 F.3d 528 (*Glatt*), the plaintiffs had worked as unpaid interns in various departments of a film production company. The plaintiffs alleged violations of the FLSA and New York Labor Law (NYLL) based on the company's failure "to pay them as employees during their internships as required by the FLSA's and NYLL's minimum wage and overtime provisions." (*Id*. at pp. 531–532.) Because the FLSA and NYLL "define 'employee' in nearly identical terms," the United States Court of Appeals for the Second Circuit "construe[d] the NYLL definition as the same in substance as the definition in the FLSA." (*Glatt*, at p. 534.)

The "specific issue" in *Glatt* was, "[W]hen is an unpaid intern entitled to compensation as an employee under the FLSA?" (*Glatt*, *supra*, 811 F.3d at p. 535.) Relying on cases such as *Portland Terminal* and *Solis*, the Second Circuit compiled a "list of nonexhaustive factors to aid courts" in determining "whether the intern or the employer is the primary beneficiary of the relationship." (*Glatt*, *supra*, at p. 536.) Because the opinion established a "new legal standard," the matter was remanded for further proceedings. (*Id*. at p. 539.) The enumerated factors, referred to as "the primary beneficiary test," were as follows:

> "1. The extent to which the intern and the employer clearly understand that there is no expectation of compensation. Any promise of compensation, express or implied, suggests that the intern is an employee—and vice versa.
>
> "2. The extent to which the internship provides training that would be similar to that which would be given in an educational environment, including the clinical and other hands-on training provided by educational institutions.
>
> "3. The extent to which the internship is tied to the intern's formal education program by integrated coursework or the receipt of academic credit.

"4. The extent to which the internship accommodates the intern's academic commitments by corresponding to the academic calendar.

"5. The extent to which the internship's duration is limited to the period in which the internship provides the intern with beneficial learning.

"6. The extent to which the intern's work complements, rather than displaces, the work of paid employees while providing significant educational benefits to the intern.

"7. The extent to which the intern and the employer understand that the internship is conducted without entitlement to a paid job at the conclusion of the internship." (*Glatt*, *supra*, 811 F.3d at pp. 536–537.)

In *Schumann v. Collier Anesthesia*, *P.A.*, *supra*, 803 F.3d 1199 (*Schumann*), the plaintiffs were "former student registered nurse anesthetists … who attended a master's degree program at Wolford College, LLC, with the goal of becoming certified registered nurse anesthetists." (*Id.* at p. 1202, fns. omitted.) The defendants owned Wolford College, LLC, and also held ownership interests in "Collier Anesthesia, P.A., a Florida corporation that provides anesthesia services." (*Id*. at p. 1203.) "During the course of their study, the [plaintiffs] participated in a clinical curriculum, which, under Florida law, was a prerequisite to obtaining their master's degrees." (*Id*. at p. 1202.)

The *Schumann* plaintiffs "obtained some, if not all, of their clinical education at facilities where Collier Anesthesia practices anesthesiology. But the [plaintiffs] viewed their clinical efforts as more than just education; they filed suit alleging that they served as 'employees' of [the defendants] for purposes of the FLSA and that [the defendants] unlawfully failed to compensate them with wages and overtime pay." (*Schumann*, *supra*, 803 F.3d at p. 1204.) The United States Court of Appeals for the Eleventh Circuit considered whether the district court had properly awarded the defendants summary judgment. The Eleventh Circuit adopted *Glatt*'s primary beneficiary test, concluded the district court had used the wrong standard to evaluate the evidence, and remanded the case without deciding the question of whether plaintiffs "were 'employees' for purposes of the FLSA." (*Schumann*, at p. 1215; see *id.* at pp. 1211–1215.)

20.

This historical background brings us to *Benjamin*, i.e., the opinion primarily relied upon by defendants and the trial court.  There, the plaintiffs were "students of cosmetology and hair design at schools in California and Nevada operated by defendant B&H Education, Inc., under the name of Marinello Schools of Beauty." (*Benjamin*, *supra*, 877 F.3d at p. 1141.)  Marinello Schools of Beauty [Marinello] "offers discounted cosmetology services to the public through salons staffed by vocational students who do not receive compensation." (*Id*. at p. 1142.)  Under California and Nevada regulations, before applicants could take the cosmetology licensing exam, they had to "take part in hundreds of hours of classroom instruction, including observing demonstrations, and practical training that includes performing services on a person or mannequin." (*Ibid*.)  The plaintiffs' unpaid work in the salons, characterized in the opinion as "clinical experience," counted toward the number of hours of practical training required by the California Board of Barbering and Cosmetology.  (*Ibid*., citing Cal. Code Regs., tit. 16, §§ 950.2, 928, subd. (a).)

The *Benjamin* defendants were alleged to have "exploited the [p]laintiffs for their unpaid labor … by not paying them for their work in Marinello's salons, by leaving them unsupervised in the salon, and by requiring them to perform services that they already could do as opposed to services that they needed to learn for the licensing exams." (*Benjamin*, *supra*, 877 F.3d at p. 1142.)  The students claimed they were employees within the meaning of the FLSA and under state law and thus entitled to compensation.  They appealed a summary judgment ruling in favor of the defendants to the United States Court of Appeals for the Ninth Circuit.  (*Benjamin*, at p. 1141.)

The Ninth Circuit framed the issue in terms of whether the plaintiffs "should be treated as employees rather than students." (*Benjamin*, *supra*, 877 F.3d at p. 1143.)  Following a discussion of cases that included *Portland Terminal*, *Solis*, *Glatt*, and *Schumann*, it concluded *Glatt*'s primary beneficiary test is "the most appropriate test for deciding whether students should be regarded as employees under the FLSA."

21.

(*Benjamin*, at p. 1147.)  As for the causes of action under California law, which were described in general terms as including claims for "minimum and overtime wages" (*id*. at p. 1142), the Ninth Circuit assumed the California Supreme Court would also analyze the issue using a test "similar to the FLSA primary beneficiary test" (*id*. at p. 1150).

In reaching its conclusion regarding California law, the Ninth Circuit emphasized the fact the plaintiffs were students of the defendant school.  California's pre-*Dynamex* case law, which had applied variations of the common law "control test," was rejected as being unhelpful "in the educational context, where the school is in charge."  (*Benjamin*, *supra*, 877 F.3d at p. 1149.)  The opinion says that "schools typically exercise significant control over their students, but that does not make them employers," and concludes "the California Supreme Court would have no reason to look to the wage order definition of employer to determine whether these plaintiffs are students or employees."  (*Ibid*.)

A key distinction between this case and *Portland Terminal*, *Solis*, *Glatt*, *Schumann*, and *Benjamin* is here plaintiff was *not* an unpaid intern or trainee.  She was a paid postdoctoral trainee who was no longer in school and had written agreements with defendants specifying the terms of payment for her services.  It is undisputed she was paid for the work.  The fact she was not a student and her claims did not allege an employment relationship with a school in which she was enrolled further distinguishes *Solis*, *Schumann*, and *Benjamin*.  The question of what standard applies under California law to determine the worker classification of an unpaid student intern/trainee is not presented in this case and we express no opinion on that issue.

More importantly, *Benjamin* predates *Dynamex*.  The California Supreme Court has explained, "In *Dynamex*, this court was faced with a question of first impression: What standard applies under California law in determining whether workers should be classified as employees or independent contractors for purposes of the obligations imposed by California's wage orders?  In addressing that question, we concluded that under one of the definitions of 'employ' set forth in all California wage orders—namely,

22.

to 'suffer or permit to work'—*any worker who performs work for a business is presumed to be an employee who falls within the protections afforded by a wage order*." (*Vazquez v. Jan-Pro Franchising Internat., Inc., supra,* 10 Cal.5th at p. 948, italics added.)

Furthermore, the Ninth Circuit had no occasion to consider the legislative mandates of California's Psychology Licensing Law. The *Benjamin* plaintiffs were unpaid cosmetology students, and California permits such individuals to "work as an unpaid extern in an establishment participating in the educational program of the school." (Bus. & Prof. Code, § 7395.1, subd. (a).) During the time period at issue, the Psychology Licensing Law did not allow prospective licensees to work as psychological assistants outside the context of an employer/employee relationship.

Former section 2913 of the Business and Professions Code permitted a psychological assistant to be "employed by a licensed psychologist" or other qualified party (*id.,* former subd. (a)), but it declared, "No psychological assistant may provide psychological services to the public for a fee, monetary or otherwise, *except as an employee* of a licensed psychologist, licensed physician, contract clinic, psychological corporation, or medical corporation." (*Id.,* former subd. (d), italics added; see Stats. 1989, ch. 888, § 3; Stats. 2015, ch. 529, § 2.) Accordingly, the CBP form the parties submitted as part of plaintiff's registration as Dr. Ortiz-Nance's psychological assistant was entitled, "Application to Employ A Psychological Assistant (Pursuant to Section 2913 of the Business and Professions Code)." Given the state law requirement of an employer/employee relationship, the federal primary beneficiary test—which is designed to distinguish unpaid student interns and trainees from employees under the FLSA—has little practical relevance or utility in this case.

Defendants argue "California looks to the federal *Portland Terminal* opinion, and its progeny such as *Benjamin*, to guide its analysis of whether employment status should be conferred upon a trainee." We are unable to locate a single published or unpublished California appellate court opinion citing *Benjamin*, *Schumann*, or *Solis*, or even

mentioning the primary beneficiary test. There is one published case in which *Portland Terminal* and *Glatt* are discussed. In *Kao v. Holiday* (2017) 12 Cal.App.5th 947, the plaintiff asserted claims under both the FLSA and California law. (*Kao*, at pp. 951, 953.) The *Kao* opinion cites to *Portland Terminal* and *Glatt* while discussing the FLSA's definition of an employee. (*Kao*, at pp. 955–956.) Incidentally, *Kao* concluded the fact the plaintiff was paid for his services indicated he was an employee. (*Ibid*.)

### B. The *Borello* and *Dynamex* Tests

"Under the common law, '"[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired …."'" (*Ayala v. Antelope Valley Newspapers*, *Inc*. (2014) 59 Cal.4th 522, 531.) "[W]hat matters under the common law is not how much control a hirer *exercises*, but how much control the hirer retains the *right* to exercise." (*Id*. at p. 533.) "Perhaps the strongest evidence of the right to control is whether the hirer can discharge the worker without cause, because '[t]he power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities.'" (*Id*. at p. 531.)

In *Borello*, the California Supreme Court approved the consideration of secondary factors, "derived principally from the Restatement Second of Agency" (*Borello*, *supra*, 48 Cal.3d at p. 351), which "supplement the central inquiry into the right of control" (*Ayala v. Antelope Valley Newspapers*, *Inc*., *supra*, 59 Cal.4th at p. 538). Those factors include "(a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of

24.

payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee." (*Borello*, *supra*, at p. 351.)

The *Borello* test "calls for consideration of all potentially relevant factual distinctions in different employment arrangements on a case-by-case, totality-of-the-circumstances basis." (*Dynamex*, *supra*, 4 Cal.5th at p. 954.) It focuses "on the intended scope and purposes of the particular statutory provision or provisions at issue. In other words, *Borello* calls for application of a *statutory purpose* standard that considers the control of details and other potentially relevant factors … in order to determine which classification (employee or independent contractor) best effectuates the underlying legislative intent and objective of the statutory scheme at issue." (*Id*. at p. 934.)

The *Dynamex* standard eschews the "multifactor, all the circumstances" approach in favor of "a simpler, more structured test for distinguishing between employees and independent contractors" in the wage and hour context. (*Dynamex*, *supra*, 4 Cal.5th at p. 955.) The burden is placed "on the hiring entity to establish that the worker is an independent contractor who was not intended to be included within the wage order's coverage." (*Id*. at p. 957.) To satisfy this burden, one must "establish *each* of the three factors embodied in the ABC test—namely (A) that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and* (B) that the worker performs work that is outside the usual course of the hiring entity's business; *and* (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed." (*Ibid*.)

With regard to part A, "depending on the nature of the work and overall arrangement between the parties, a business need not control the precise manner or details of the work in order to be found to have maintained the necessary control that an employer ordinarily possesses over its employees, but does not possess over a genuine

25.

independent contractor." (*Dynamex*, *supra*, 4 Cal.5th at p. 958.) "The hiring entity must establish that the worker is free of such control." (*Ibid*.)

Part B reflects "that one principal objective of the suffer or permit to work standard [in IWC wage orders] is to bring within the 'employee' category *all* individuals who can reasonably be viewed as working '*in [the hiring entity's] business*' [citation], that is, all individuals who are reasonably viewed as providing services to the business in a role comparable to that of an employee …." (*Dynamex*, *supra*, 4 Cal.5th at p. 959.) "[A] focus on the nature of the workers' role within a hiring entity's usual business operation also aligns with the additional purpose of wage orders to protect companies that in good faith comply with a wage order's obligations against those competitors in the same industry or line of business that resort to cost saving worker classifications …." (*Id*. at p. 960.) "Competing businesses that hire workers who perform the same or comparable duties within the entities' usual business operations should be treated similarly for purposes of the wage order." (*Id*. at p. 961.)

"[I]n order to satisfy part C of the ABC test, the hiring entity must prove that the worker is customarily engaged in an independently established trade, occupation, or business." (*Dynamex*, *supra*, 4 Cal.5th at p. 963.) "Such an individual generally takes the usual steps to establish and promote his or her independent business …. When a worker has not independently decided to engage in an independently established business but instead is simply designated an independent contractor by the unilateral action of a hiring entity, there is a substantial risk that the hiring business is attempting to evade the demands of an applicable wage order through misclassification." (*Id*. at p. 962.)

### C.     Labor Code Section 2783

Defendants contend, without substantive argument, that "*Dynamex* has been specifically exempted from applying to the profession of Psychology" by Labor Code

section 2783.  They selectively quote part of the statute while omitting other key language.  The relevant statutory text is as follows:

> "[Labor Code s]ection 2775 and the holding in *Dynamex* do not apply to the following occupations as defined in the paragraphs below, and instead, the determination of employee or independent contractor status for individuals in those occupations shall be governed by *Borello*:  [¶] … [¶]

> "(b) A physician and surgeon, dentist, podiatrist, *psychologist*, or veterinarian *licensed by the State of California pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code*, performing professional or medical services provided to or by a health care entity, including an entity organized as a sole proprietorship, partnership, or professional corporation as defined in Section 13401 of the Corporations Code."  (Lab. Code, § 2783, italics added.)

The plain language of the statute limits the exception to "*licensed*" psychologists.  "'Licensed psychologist' means an individual to whom a license has been issued pursuant to the provisions of [Chapter 6.6 of Division 2 of the Business and Professions Code], which license is in force and has not been suspended or revoked."  (Bus. & Prof. Code, § 2902, subd. (a).)  It is undisputed plaintiff was not a licensed psychologist.  She was a psychological assistant, which by definition is a person who is not a licensed psychologist.  (*Id*., § 2913.)  No further discussion is required.  (See *Estill v. County of Shasta* (2018) 25 Cal.App.5th 702, 712 ["We are not required to examine undeveloped claims"].)

## D.    Business and Professions Code, Former Section 2913

As previously discussed, at the time plaintiff was registered as Dr. Ortiz-Nance's psychological assistant, former section 2913 of the Business and Professions Code (former section 2913) stated, in relevant part, "No psychological assistant may provide psychological services to the public for a fee, monetary or otherwise, *except as an employee* of a licensed psychologist, licensed physician, contract clinic, psychological corporation, or medical corporation."  (*Id*., subd. (d), italics added.)

27.

Effective January 1, 2016, the phrase "for a fee, monetary or otherwise" was deleted. (Stats. 2015, ch. 529, § 2.) The provision thus read: "No psychological assistant may provide psychological services to the public except as an employee of a licensed psychologist, licensed physician, contract clinic, psychological corporation, or medical corporation." (*Ibid*.) As of January 1, 2017, the statute has been amended to remove all language confining work as a psychological assistant to an employer/employee relationship. (Stats. 2016, ch. 484, § 2.)

Defendants argue the 2017 amendment proves former section 2913 was "outdated" at the time of the underlying events and, therefore, the statutory requirements are not probative of whether plaintiff was defendants' employee. However, defendants do not argue the statutory changes are retroactive, and there is nothing to indicate such a legislative intent. (See *Californians for Disability Rights v. Mervyn's*, *LLC* (2006) 39 Cal.4th 223, 230 [noting "the presumption that statutes operate prospectively absent a clear indication the voters or the Legislature intended otherwise"]; accord, *City of Long Beach v. Department of Industrial Relations* (2004) 34 Cal.4th 942, 953; see *Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1210, fn. 15 ["the rationale for the *Estrada* ruling [*In re Estrada* (1965) 63 Cal.2d 740] bears little relationship to the determination of the retroactivity of most nonpenal statutes"].) Therefore, defendants' arguments are not persuasive.

On the other hand, the fact former section 2913 required the professional relationship between Dr. Ortiz-Nance and plaintiff to be one of employer/employee does not mean such a relationship automatically existed. Plaintiff's own evidence illustrates this point. In January 2014, the parties submitted a required form to the CBP to renew plaintiff's registration as Dr. Ortiz-Nance's psychological assistant. Plaintiff and Dr. Ortiz-Nance both signed directly below a section entitled "Employer/Employee Disclosure," which read (in relevant part):

"In lieu of submitting documentary evidence of the employer/employee relationship, we do hereby certify that this relationship is that of employer/employee as required by the Laws and Regulations Relating to the Practice of Psychology. We declare under penalty of perjury under the laws of the State of California that the information provided on this form is true and correct."

The parties' certification would not have been necessary if the requirements of former section 2913 meant plaintiff was Dr. Ortiz-Nance's employee as a matter of law. The label parties assign to themselves "is not dispositive and will be ignored if their actual conduct establishes a different relationship." (*Estrada v. FedEx Ground Package System*, *Inc*. (2007) 154 Cal.App.4th 1, 10–11.) By the same token, Dr. Ortiz-Nance's use of IRS Form 1099-MISC to characterize plaintiff's earnings as "Nonemployee compensation" does not prove she was an independent contractor. "[A] business cannot unilaterally determine a worker's status simply by assigning the worker the label 'independent contractor' or by requiring the worker, as a condition of hiring, to enter into a contract that designates the worker an independent contractor." (*Dynamex*, *supra*, 4 Cal.5th at p. 962.)

## DISPOSITION

The judgment is reversed and the matter is remanded for further proceedings consistent with this opinion. Plaintiff shall recover her costs on appeal.

PEÑA, J.

WE CONCUR:

HILL, P. J.

DETJEN, J.