Filed 8/31/22  Estrada v. Scars of the Mind Picture Co. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MICHAEL ESTRADA et al., | B314136 |
| Plaintiffs and Appellants, | |
| v. | (Los Angeles County Super. Ct. No. 18STCV06219) |
| SCARS OF THE MIND PICTURE COMPANY, LLC et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daniel S. Murphy, Judge.  Affirmed.

Harris & Ruble, Alan Harris and Lin Zhan for Plaintiffs and Appellants.

Lyden Law Corporation and Christine Lyden for Defendants and Respondents.

_____

Appellants Michael Estrada, James Stout, and Patricia Stout (collectively, appellants) are active or retired Los Angeles Police Department (LAPD) officers who worked as traffic control officers at an on-location film shoot that occurred over three days in Elysian Park, Los Angeles. Appellants were paid directly by respondent Scars of the Mind Picture Company, LLC (Scars of the Mind). Each appellant's check was returned unpaid because of insufficient funds. Once she was informed of the bounced checks, Leslie Bates, an individual respondent and a producer of the film, wrote checks from her personal account to each appellant, in an amount equal to the compensation owed as well as bank charges incurred by each officer. Nonetheless, the three officers retained counsel and filed suit to recover various remedies afforded to employees under the Labor Code, as well as attorney's fees. Respondents Scars of the Mind, Bates and Vince Lozano contended that these statutory remedies were inapplicable because the officers were independent contractors rather than employees.

Following a two-day bench trial, the court entered judgment in favor of respondents, finding that the officers were independent contractors rather than employees, and that the statutes under which they sought relief were inapplicable to independent contractors.

As discussed in more detail below, we affirm the judgment on the ground that the court's finding that appellants were independent contractors is supported by substantial evidence. Our review of the court's findings is limited to whether substantial evidence exists; as it does, we are not concerned with the manner in which the trial court resolved conflicts in the

2

evidence, with the weight he gave to individual witnesses or exhibits, or to his determinations of the credibility of any witness.

## FACTUAL AND PROCEDURAL BACKGROUND

Scars of the Mind[1] is a motion picture production company specializing in low-budget independent films. In the spring of 2018, it was engaged in filming a theatrical motion picture titled "Acts of Desperation."[2] Filming took place at various locations within the "30-mile" zone centered in Hollywood, including Elysian Park in Los Angeles. Not until Scars of the Mind applied for a permit to film in Elysian Park did it learn that the conditions of the permit for each day's shooting included the presence of at least two police officers for traffic control. Bates sent an email to Eddie Esparza, principal of Pacific Production Services (PPS), inquiring about the availability of police officers to work at the filming location. Bates had no prior experience

---

[1] Lozano, a principal of Scars of the Mind, and Bates, a producer of "Acts of Desperation," are also named defendants and respondents. For simplicity of reference, we refer to respondents collectively as "Scars of the Mind."

[2] Our factual and procedural background is derived in part from undisputed aspects of the trial court's statement of decision and the parties' filings. (See *Baxter v. State Teachers' Retirement System* (2017) 18 Cal.App.5th 340, 349, fn. 2 [utilizing the summary of facts provided in the trial court's ruling]; *Artal v. Allen* (2003) 111 Cal.App.4th 273, 275, fn. 2 [" 'briefs and argument . . . are reliable indications of a party's position on the facts as well as the law, and a reviewing court may make use of statements therein as admissions against the party' "].) In the Appealability and Standard of Review section, *post*, we note that the trial court's orders are presumed correct.

with Esparza or his firm, but learned of it from a reference on the website of FilmLA, the film permitting authority for Los Angeles. Esparza responded that police officers were available. Thus, on the first day of shooting in Elysian Park, retired LAPD officer Elvira Gutierrez and Estrada presented themselves to the production staff at the Elysian Park location. Gutierrez had worked "hundreds" of film jobs, while Estrada was doing so for the first time. They learned of the job, where to go and when to start from Esparza, not from anyone at Scars of the Mind.

Gutierrez testified that, based on her experience, she was "uneasy" about the production and found Bates to be "unprofessional." In fact, on her first day on location Gutierrez refused to allow filming to begin until she received confirmation that Scars of the Mind had actually paid the fee for its filming permit. At the end of the day, at the request of Scars of the Mind, Estrada filled out a W-9 form. Gutierrez prepared a handwritten invoice for herself and Estrada, taking care to include not only each officer's daily compensation but also an additional 15 percent in order to offset the self-employment tax she and Estrada would incur and a $75 "kit box rental" fee to each officer for furnishing his or her uniform, gun and motorcycle. Gutierrez and Estrada returned for the third and final day of filming at Elysian Park, again as instructed by Esparza of PPS.[3]

On the second day of shooting, James and Patricia Stout were sent by PPS to work at the Elysian Park location. James

_____

[3] Gutierrez took her checks to the bank immediately following the last day of filming. Her checks were paid by the bank, and she is not a party to this action.

4

Stout is a retired motor patrol officer who testified that he has worked on hundreds of film and television jobs since 2015. His wife, Patricia, was at the time an active-duty motor patrol officer with less motion picture experience than her husband. Like Gutierrez and Estrada, the Stouts completed W-9 forms as individuals/sole proprietors, and each demanded and received an additional 15 percent of their daily compensation as reimbursement for anticipated self-employment taxes along with the $75 kit box rental fee.

The problems that gave rise to this action arose after filming ended at Elysian Park, when banks began to return appellants' checks for insufficient funds. The first that Scars of the Mind learned of this was when James Stout sent a text message informing Bates that his check had bounced following several attempts to deposit it. Bates responded promptly, expressed her regrets, and assured Stout that the matter would be resolved. Ultimately, Bates wrote a check from her personal funds in an amount that covered both James Stout's agreed-upon compensation plus the fees his bank charged him for attempting to deposit his check from Scars of the Mind. The same happened to the other appellants, Patricia Stout and Estrada. Both were paid from Bates's personal funds, in full, plus assessed bank charges.[4]

All three appellants testified that they felt they had received what was owed from Scars of the Mind. Nonetheless,

---

[4] In fact, Bates went much further. In an attempt to forestall the pending lawsuit, Bates issued W-2 forms to the police officers who worked on "Acts of Desperation" and, through Scars of the Mind, paid their taxes even though she had already paid them an additional 15 percent for self-employment tax.

they later retained counsel and filed suit to recover statutory remedies and penalties available to employees. Their claims included a demand for 30 days' wages for each of the three officers, pursuant to Labor Code section 203; a similar demand for paying wages with a bad check, pursuant to Labor Code section 203.1; failure to pay minimum wage and overtime under Labor Code sections 510 and 1194; failure to provide pay stubs in violation of Labor Code section 226, subdivision (a); failure to provide employment records in violation of Labor Code sections 226, subdivision (b), and 1198.5; for restitution under Business and Professions Code section 17200, and for civil penalties under the Private Attorneys General Act (Lab. Code, § 2698 et seq.).

Appellants moved for summary adjudication of their statutory claims, asserting that there was no triable issue of fact as to whether they were employees of Scars of the Mind. The trial court denied the motion, and the case proceeded to a bench trial. The parties stipulated to a number of foundational facts, including the days on which each appellant worked and the fact that appellants' checks were returned for insufficient funds. All four officers who had worked on "Acts of Desperation" testified, as did Bates and Lozano, Richard Friedman, the film's director, and the appellants' expert witnesses. After the matter was submitted, the trial court issued its tentative decision in favor of Scars of the Mind, finding that Estrada, James Stout and Patricia Stout were independent contractors and therefore not entitled to the remedies provided in the statutes that formed the basis of their claims for relief.

Appellants filed timely objections to the proposed statement of decision. Rather than identify "omissions" or "ambiguities" in the proposed decision, appellants' objections

6

argued the weight that the court should have afforded specific testimony or exhibits in order to reach the conclusion that the officers were employees of Scars of the Mind. Appellants also proposed additional findings for the court, consisting of requests to find in the officers' favor on each of their statutory claims under the Labor Code, in specific amounts. With minor changes, the trial court filed its final statement of decision and entered judgment in favor of Scars of the Mind and against all three police officers. Appellants filed a timely notice of appeal from the judgment.

## APPEALABILITY AND STANDARD OF REVIEW

This is an appeal from a final judgment; we have jurisdiction pursuant to Code of Civil Procedure section 904.1, subdivision (a)(1).[5]

"The question of what legal standard or test applies in determining whether a worker is an employee or, instead, an independent contractor" is a question of law. (*Dynamex Operations West, Inc. v. Superior Court* (2018) 4 Cal.5th 903, 942, fn. 16 (*Dynamex*).) "When the trial court applies the proper legal standard, '[t]he determination of employee or independent-contractor status is one of fact if dependent upon the resolution of disputed evidence or inferences.' [Citation.] The decision will be upheld if the court's factual findings are supported by substantial evidence." (*Becerra v. The McClatchy Co.* (2021) 69 Cal.App.5th

---

[5] Notwithstanding the clear requirement in rule 8.124(b)(1)(A) of the California Rules of Court, appellants failed to include a copy of the judgment in their appendix in lieu of a clerk's transcript. Respondents cured the omission by including the judgment in their respondents' appendix.

913, 946-947, quoting *S.G. Borrello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 349 (*Borrello*); accord, *Vendor Surveillance Corp. v. Henning* (2021) 62 Cal.App.5th 59, 75.) "As a result, appellate case law in this area arises primarily in the context of substantial evidence review of the determinations of the relevant fact finder." (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 78.)

At trial, both sides agreed that the ABC test adopted in *Dynamex* and subsequently codified at Labor Code section 2775, subdivision (b)(1) is the applicable legal test, and this is the legal standard that the trial court applied. Appellants' objections to the trial court's proposed statement of decision identified no errors of law, and their opening brief on this appeal does not urge the adoption of some standard other than the ABC test.

We recognize that some cases decided after *Dynamex* have held that the ABC test does not apply to non-wage claims. (See, e.g., *Vendor Surveillance Corp. v. Henning, supra*, 62 Cal.App.5th at p. 69; *Garcia v. Border Transportation Group, LLC* (2018) 28 Cal.App.5th 558.) While the new Labor Code provisions codifying the ABC test make clear that it applies to all cases arising under Labor Code section 2775, subdivision (b)(1), the new statutes expressly apply only "to work performed on or after January 1, 2020" (Lab. Code, § 2785, subd. (c)), making those statutes inapplicable to appellants' claims or Scars of the Mind's affirmative defenses. Further, we note that when it denied appellants' motion for summary adjudication of three causes of action asserted in the complaint, the trial court specifically noted that the ABC test was controlling only as to the claims for unpaid wages and for failure to furnish pay stubs, while the claim under

8

Labor Code section 203.1 for paying wages with a bad check was governed by the so-called common-law test under *Borrello*.

Appellants do not question the applicability of the ABC test as the legal standard to be used to evaluate all of their claims for relief. Likewise, nowhere in their objections to the trial court's proposed statement of decision did appellants take issue with the court's application of the ABC test to resolve the employee versus independent contractor issue for all of appellants' claims.[6] Accordingly, we deem any such objection to be waived by appellants, and we will review the trial court's findings of fact using the ABC test. Consequently, this appeal hinges on whether the trial court's findings of fact regarding the three ABC factors were supported by substantial evidence.

An appellant seeking to reverse findings of fact on disputed evidence faces a " 'daunting burden.' " (*Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 678.) " ' "We have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom." [Citations.]' [Citation.] When, as here, 'the evidence gives rise to conflicting reasonable inferences, one of

---

[6] In so doing, we emphasize that we do not believe that our review would lead to a different result had we applied the substantial evidence test using a different legal standard. As *Dynamex* makes clear, the ABC test is intended to be broader and more protective of employees than was the common-law test under *Borrello*; thus, we believe that if appellants are independent contractors under the test most protective of employees, there is no possibility that they have been prejudiced in the event that some of appellants' causes of action should have been analyzed under the common-law rather than the ABC test.

9

which supports the findings of the trial court, the trial court's finding is conclusive on appeal. [Citations.]' [Citation.]" (*Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 622-623.) Our power "begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874, italics omitted.) "If this 'substantial' evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld. As a general rule, therefore, we will look only at the evidence and reasonable inferences supporting the successful party, and disregard the contrary showing." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631.)

## DISCUSSION

### A.    The Adequacy of the Statement of Decision

A statement of decision under Code of Civil Procedure section 632 et seq. serves two purposes. First, it provides the reviewing court a roadmap as to the trial court's legal reasoning and findings of fact. Second, in the absence of a valid objection, it supports the presumption that the trial court impliedly found all facts needed to support the judgment. Appellants argue that we cannot presume the validity of the judgment, nor the sufficiency of the evidence supporting the trial court's findings of fact, on the ground that the statement of decision is insufficient because it contains no findings as of the terms of any contract between Scars of the Mind and appellants. We reject this argument for

10

two reasons.  First, and most important, although appellants filed 31 pages of objections to the trial court's proposed statement of decision, nowhere do they bring this alleged omission to the court's attention.  Thus, the objection has not been preserved for appeal.  (Code Civ. Proc., § 634; 7 Witkin, Cal. Procedure (6th ed. 2021) Trial, § 394, p. 346; see also *Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 494-495; *Fladeboe v. American Isuzu Motors, Inc.* (2007) 150 Cal.App.4th 42, 58.)  Second, we cannot regard this alleged omission as essential to the judgment in favor of Scars of the Mind.  In order to prevail at trial, Scars of the Mind needed to establish that appellants were not its employees. None of the elements of the ABC test (or of the common-law test, for that matter) requires the hiring entity to prove the terms of a contract in order to rebut the presumption that a worker is an employee.[7]  Indeed, in many instances where an independent contractor performs services, we would expect there not to be a formal contract.  For example, a plumber or electrician typically presents a homeowner an invoice at the conclusion of a job, much as Gutierrez and Estrada presented an invoice at the end of the first day of shooting.  Like the hypothetical plumber or electrician, appellants can hardly point to the absence of a formal contract as dispositive evidence that they were employees.

Finally, Code of Civil Procedure section 634 cannot be invoked to undermine the presumptions in favor of the validity of the lower court's judgment unless the objection to the statement

---

[7] The evidence sufficiently established all of the elements of a common count for services rendered, and each appellant admitted that he or she was ultimately fully compensated for services performed, for kit box rental, for estimated employment taxes, and for bank fees incurred.

11

of decision has substance. "[Code of Civil Procedure section 634] applies only when there is an omission or ambiguity in the trial court's decision, not when the party . . . claims the trial court's findings are irrelevant or unsupported by evidence." (*Duarte Nursery, Inc. v. California Grape Rootstock Improvement Com.* (2015) 239 Cal.App.4th 1000, 1012.) In this case, appellants' objections consisted almost entirely of arguments that the court gave insufficient weight to their evidence, or that the court should have drawn different conclusions than the ones it reached. Such objections are of no effect. "A party cannot be prevented from using the request as a way of arguing with the court rather than clarifying the grounds of its decision. But neither should a party who makes that choice be entitled to rely on the resulting document to insulate the judgment from the presumption of correctness." (*Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 559 [objections to statement of intended decision, in the form of argument, do not preserve issues for appellate review or rebut presumption of validity of trial court's decision].)[8]

---

[8] Objections in this form also waste a good deal of the reviewing court's time. To give just one example, appellants contended the testimony was "undisputed" that walkie-talkies furnished by Scars of the Mind "were used by [respondents] to give instructions to [appellants] to lock down traffic." In fact, the testimony was far from undisputed: Bates, the producer of "Acts of Desperation," testified that the respondents did not instruct the police officers when to stop traffic, and that rather than use the walkie-talkies the police officers yelled when they were stopping traffic so that even crew members without walkie-talkies would be aware. It is the sole province of the trial court to

We have independently reviewed the statement of decision. It is incomplete in one respect—it fails to address each of the causes of action asserted by appellants; instead, it only makes specific references to the causes of action arising under Labor Code sections 203, 203.1, and 226, subdivision (a). Appellants did request that the trial court make specific findings in their favor on all of their causes of action. However, appellants do not address this issue in the brief, and have thus waived any argument arising from the failure of the statement of decision to specifically address all of their causes of action. (See *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133-1134.) The omission also is harmless because each claim affords relief only to an employee rather than an independent contractor. The trial court's conclusion that appellants are independent contractors means that Scars of the Mind must prevail on all claims against it.

## B. Substantial Evidence Supports the Trial Court's Findings that Appellants Were Independent Contractors, Not Employees

### 1. *Prong A: Scars of the Mind Did Not Control Appellants*

The first of the *Dynamex* factors is whether the hiring entity—in this case, Scars of the Mind—had the right to control how appellants performed their duties as traffic control officers. The trial court found that it did not, citing evidence that appellants were required to be on site as a condition of the location filming permit and that they relied on LAPD training

___

resolve disputes in testimony and to determine the weight to afford that testimony.

13

rather than on any directions from Scars of the Mind. Specifically, the court found that "[c]oncerning traffic control, [appellants] followed the LAPD [m]anual, and [appellants] advised [respondents] when traffic was stopped. [Appellants] decided when to stop traffic and for how long traffic would be stopped. [Appellants] decided if [respondents] would be allowed to film and if [respondents] were complying with the City of Los Angeles' permit." The trial court's determinations that Scars of the Mind did not control appellants and lacked the right to do so are supported by substantial evidence.

The terms of the film permits introduced in evidence are particularly instructive. The Elysian Park film shoot required permits from the City of Los Angeles and from Caltrans, as well as a "monitor" from the Los Angeles Department of Recreation and Parks. The Los Angeles filming permit allowed "Intermittent traffic control—2 minutes standard." The filming permit from the California Film Commission allowed "ROLLING BREAKS/ITC [Intermittent traffic control] ALLOWED PER DISCRETION OF CHP/LAW ENFORCEMENT OFFICER IN CHARGE AT SCENE." Both permits, then, left Scars of the Mind no discretion as to how traffic control was to be accomplished, and made it clear that traffic control were in the hands of the law enforcement officers on scene—that is to say, on appellants. Even more illuminating is the work permit that each appellant was required to have in order to work while off-duty. Paragraph 11 of the "Rules and Regulations" accompanying the work permit application reads as follows, in part: "Upon reporting to a work site, officers shall review and ensure compliance with the conditions of the filming permit. Officers shall ensure compliance with arrival and departure times, and

14

authorized filming locations issued by the FilmLA Inc.  Officers shall not allow any activity or conduct that is in violation of local and state law, nor allow any filming condition that is not authorized by the permit."  The officers took this seriously: Gutierrez would not permit filming on the morning of April 7, until she received confirmation that Scars of the Mind had paid the permit fee.  Paragraph 13 of the same "Rules and Regulations" directs officers to be familiar with, inter alia, Los Angeles Municipal Code section 80.03 governing traffic control,[9] and states that officers "shall adhere to those rules and regulations."  Only current or former motor patrol officers, or retired motor patrol officers who left the force in good standing, are permitted to work as traffic control officers at filming sites.

We have quoted these provisions at length because they provide ample support for the trial court's conclusion that Scars of the Mind was subordinate to the discretion of appellants and Gutierrez when it came to traffic control during the shoot at Elysian Park.  The provisions of the permits matched actual practice on the set: according to Bates, it was the officers who instructed the film crew when traffic would stop and resume, not the other way around.  The officers were "very experienced" at traffic control on the set, and they were "in charge" on all three

---

[9] Section 80.03 of the Los Angeles Municipal Code provides in pertinent part that "No person other than a Police Officer, a person deputized by the Chief of Police, a Traffic Officer, or an off duty or retired police officer authorized under the provisions of Section 80.03.1 shall direct or attempt to direct traffic . . . ."  Section 80.03.1 provides for the work permits, used by appellants, authorizing off-duty and retired officers to control traffic at commercial filming sites.

days of filming. Bates observed no one from the film crew instructing the officers on how to perform traffic control. The officers' testimony was in accord: James Stout, for example, testified that no one from Scars of the Mind instructed him on how to control traffic at Elysian Park, and that he relied on his LAPD training to do so. Gutierrez testified that she held traffic pursuant to the terms of the filming permit, which limited traffic breaks to two minutes at a time. Estrada testified that he followed the lead of Gutierrez, and Patricia Stout testified that she took direction from her husband. The evidence shows that, while the times when traffic breaks were required was determined by the pace of filming, the decision whether to implement a traffic break and the length of time when traffic could be stopped was controlled by the officers on set rather than by Scars of the Mind.

Appellants insist that the trial court failed to give appropriate weight to the fact that Scars of the Mind provided walkie-talkies to the traffic officers to aid in communicating with the film crew. The trial court likened this to a homeowner allowing a gardener, roofer or pool cleaner the use of a rake, ladder or skimmer. We agree. A walkie-talkie was potentially a useful piece of equipment but was not essential for the police officers to control traffic. In fact, Bates testified that there was no provision for walkie-talkies in the film budget because the crew and set were both small. She further testified that the officers communicated by yelling, rather than use the walkie-talkies, so that everyone on the set, regardless of whether he had a walkie-talkie, knew when traffic was being stopped or allowed to resume. For the sake of efficiency, and to ensure that filming could be completed within the time permitted, Scars of the Mind

16

distributed walkie-talkies that helped appellants and film crew alike do their jobs. The issue before the trial court was the right of control, and the court correctly concluded that furnishing a walkie-talkie to a police officer did not undermine that officer's sole discretion as to the means and duration of controlling traffic at the filming site. The trial court's conclusion that prong A of the ABC test was met by evidence that appellants were free from the control and direction of respondents, is supported by substantial evidence.

    2.    *Prong B: Appellants Were in a Different Business than Scars of the Mind*

The second factor under *Dynamex* looks to whether the putative employees were in the same business as the hiring entity, or if they performed a different type of service. The intent of this factor is to protect "individuals whose services are provided within the usual course of the business of the entity for which [services are] performed and thus who would ordinarily be viewed by others as working in the hiring entity's business and not as working, instead, in the worker's own independent business." (*Dynamex, supra*, 4 Cal.5th at p. 959.)

Application of this prong is straightforward in this case: appellants are retired or active-duty police officers, while Scars of the Mind is a film production company. The trial court found that appellants are in a different business than Scars of the Mind, and that finding is supported by substantial evidence. In explicating, this factor, the *Dynamex* court contrasted a plumber hired by a retail store with a cake decorator servicing a bakery for custom cakes. (*Dynamex, supra*, 4 Cal.5th at pp. 959-960.) The trial court suggested another, equally apt analogy after hearing the evidence in this case: "a lifeguard for a country club

17

would likely be considered an employee when the country club's pool is open seven days a week. However, a lifeguard would likely be considered an independent contractor if lifeguard was retained for a one[-]day house party."

Appellants devoted substantial effort at trial attempting to establish a "standard practice" in the motion picture industry that police officers were treated as employees rather than independent contractors. The trial court found no such practice, and evidence on the point, which at best for appellants was conflicting, does not warrant a finding that the trial court's conclusion is unsupported by substantial evidence.

Witnesses from Scars of the Mind testified that no such standard practice existed, at least as to small independent production companies. Appellants' own expert witness, Jon Katzman, testified that police officers are occasionally treated as independent contractors, and that employment status varied depending on if the person was working for several days as opposed to a day or so. Appellants testified that they were almost always treated as employees, but that exceptions did occur. Finally, the trial court admitted, over appellants' objection, evidence that payment for police officers was included in the cost of their filming permits in both Glendale and Burbank with compensation in both cases paid directly to those cities rather than to the individual officers.

Appellants also assert that the trial court committed legal error when it focused its analysis on the specific evidence pertaining to Scars of the Mind, a small production company which "may never use police or very infrequently use police" and accorded less weight to the experience of some appellants with "large production [companies]" which "need security and traffic

18

control every day [and] may decide [to] hire security and traffic control as employees." We see no error.

Appellants' evidence fell well short of proving an industry standard that police officers are paid as employees, and they failed to prove that the actual services performed by appellants were within the usual course of business of a motion picture producer. Scars of the Mind is not in the business of traffic control, and the terms of its permit to film at Elysian Park forbade it from being in that business. Evidence that some (perhaps even most) large production companies choose to pay police officers as part-time employees, rather than independent contractors, is not enough to compel the conclusion that, on all film shoots, the police officers' services "are provided within the usual course of the hiring entity's business." (*Dynamex*, *supra*, 4 Cal.5th at p. 960.) In the present case, the issue is whether the off-duty or retired police officers who worked for Scars of the Mind for one or two days, all of whom were in uniform and performing duties typically associated with police officers, "would ordinarily be viewed by others as working in the [film company's] business." (*Id*. at p. 959.) The trial court's conclusion that they would not be so viewed is supported by the evidence and not infected with any legal error.

We also find unpersuasive the contention that treating appellants as employees is necessary "to create a level playing field among competing businesses in the same industry in order to prevent the type of 'race to the bottom' that occurs when businesses implement new structures or policies that result in substandard wages and unhealthy conditions for workers." (*Dynamex*, *supra*, 4 Cal.5th at p. 960.) Apart from the fact that this statement from *Dynamex* is at most contextual commentary

19

on the rationale for industry-wide wage orders, to which the court was analogizing in its ruling (*ibid.*), the concept has no application here.  On the record before us, the film producer had no opportunity to select among available police officers; instead, the producer dealt with one or more intermediaries who assigned officers from a roster maintained by that intermediary.  Scars of the Mind did not negotiate the officers' compensation; instead, Estrada testified that compensation was based on a schedule or "cheat sheet" maintained by the LAPD film unit, the organization that administers work permits for off-duty and retired police officers who wish to do film work.[10]  Even the $75 kit box rental fee charged by appellants originated with the police officers' union.  In short, the labor market for police officers working film shoots in Los Angeles, particularly for a small film company like Scars of the Mind, was shown to be one in which the hiring entity had no discernable market power.

It cannot credibly be contended that Scars of the Mind's hiring of four officers for one or two days of work on financial terms it could not dictate, and paying the officers as independent contractors, would have any impact on the industry as a whole.  The "race to the bottom," where hiring entities vie with one

---

[10] The evidence available to us corroborates Estrada's testimony that compensation is based on a fixed schedule.  Appellants placed some of James Stout's payroll records in evidence.  These records show that James Stout was paid the same hourly rate by a number of different production companies from mid-2018 to June of 2019, at which point the hourly rate increased slightly and thereafter remained the same for a number of jobs, with different production companies, through the end of 2019.

another to misclassify workers considered to be core to their business in order to save money on wages and benefits, is a legitimate concern. In the small corner of the labor market that we are concerned with here, however, the concern is not justified.

Appellants' final argument on this prong of the ABC test is that the trial court should have afforded more weight to wage statements showing occasions where production companies paid James Stout as an employee rather than an independent contractor. The trial court found these wage statements not persuasive. We agree. The issue is not what other film production companies do; the issue is what was done in this instance. Other production companies are certainly free to treat police officers as employees, and no doubt there are valid reasons to do so. It was for the trial court to determine what weight to give James Stout's wage statements from other film shoots, and we cannot second-guess the court's determination, which is supported by substantial evidence.

3. *Prong C: Appellants Operated Independently from Scars of the Mind*

The third element of *Dynamex's* ABC test protects a worker who "has not independently decided to engage in an independently established business but instead is simply designated an independent contractor by the unilateral action of a hiring entity." (*Dynamex, supra*, 4 Cal.5th at p. 962.)

The trial court found that all three appellants were in business for themselves: "At all pertinent times, [appellants] were reserve or full-time LAPD officers, and LAPD gave [appellants] permission for outside employment to work security and/or traffic control. [Appellants] have worked for dozen[s], if not hundreds, of different corporations wherein they provided

21

security and traffic control services similar to the work that [appellants] provided for Scars [of the Mind]. [Appellants] used a third-party [PPS] to obtain work with these various corporations."

The fact that each appellant had secured permission from the LAPD to work on film sets as a retired or off-duty officer, and had made themselves available for assignments through PPS, is strong evidence that each officer treated film work as an independent side business. So is the fact that the officers paid PPS a fee (called a "toke") from each day's earnings on jobs secured through PPS, and the fact that it was the police officers, not the production companies, who paid PPS for job placements.

Details of the officers' compensation, too, supports a finding that they are independently in business. The officers' compensation was not negotiated with Scars of the Mind; instead, it was PPS that communicated the amount the officers were to be paid. Each appellant filled out a W-9 form, identifying him or herself as an individual or sole proprietor. Their testimony that they did not understand the consequences of presenting a W-9 form apparently was given little or no weight by the trial court, and we do not second-guess that decision.

Still stronger evidence that appellants knew they were independent contractors is the fact that they demanded, and received, an additional 15 percent of their daily compensation to offset the self-employment taxes they would incur as independent contractors, as well as their demanding, and receiving, a daily kit box rental fee covering their uniform and equipment. James Stout's testimony is particularly instructive: although he insisted he had no idea that signing a form W-9 meant he would be treated as an independent contractor, when presented the W-9

form he told Bates "that there would be a 15 percent pay hike due to that because of taxes." All of these facts are clear indicia of individuals who understood they were acting as independent contractors rather than employees, and who adjusted their compensation accordingly. The trial court was the sole judge of appellants' credibility; its decision to give greater weight to their conduct than to their testimony was for the trial court alone.

Appellants urge us to conclude that the third ABC prong is not met as to Estrada, who was working his first film production job when he accompanied Gutierrez to Elysian Park to work on "Acts of Desperation." This argument is unavailing.

The test is not whether a given appellant has years of experience in film work, it is whether the appellant has an independent business providing such work. If an appellant has such a business, it is as true on the first job worked as on the one hundredth: nothing in *Dynamex* suggests that someone working his first job is an employee as a matter of law, regardless of his circumstances. Here, Estrada, like the other appellants, obtained permission from the LAPD to work on film shoots during his off-duty time; he made himself available for such work through PPS; he compensated PPS for furnishing him for film work; and he demanded and received additional compensation for his self-employment taxes and his kit box rental.

The foregoing facts are sufficient to support the trial court's finding in favor of Scars of the Mind on the third of the *Dynamex* factors.

## DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.

NOT TO BE PUBLISHED


                                          KELLEY, J.*


We concur:



CHANEY, J.



BENDIX, Acting P. J.

---

\* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.